UNITED STATES, Appellee,

v.

Victor LEVY–CORDERO,
Defendant–Appellant.

UNITED STATES, Appellee,

v.

William ROMERO–LEWIS, a/k/a Caco,
El Teniente, Defendant–Appellant.

UNITED STATES, Appellee,

v.

Jose Samuel FORTY–ESTREMERA,
a/k/a Sammy, Defendant–
Appellant.

Nos. 93–1679, 93–2015 and 93–2087.

United States Court of Appeals,
First Circuit.

Heard March 7, 1995.

Decided Oct. 16, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Dec. 12, 1995.

1004

Jeffrey S. Weiner, with whom Molly Ebelhare and Jeffrey S. Weiner, P.A., Attorneys at Law, were on brief, for appellant Victor Levy–Cordero.

Carlos E. Geigel, for appellant William Romero–Lewis.

Frank D. Inserni, by Appointment of the Court, for appellant José Samuel Forty–Estremera.

Lena Mitchell, Attorney, Criminal Division, Narcotic and Dangerous Drug Section, Department of Justice, with whom Jo Ann Harris, Assistant Attorney General, Theresa M.B. Van Vliet, Chief, Criminal Division, and Guillermo Gil, United States Attorney, were on brief for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

TORRUELLA, Chief Judge.

Appellants were among thirty-nine defendants charged in a thirty-nine count superseding indictment. All three appellants appeal their convictions for conspiracy to possess with intent to distribute more than 10,000 kilograms of cocaine and more than 1,000 kilograms of marijuana. In addition, they appeal their convictions on various drug trafficking and drug possession charges. For the reasons stated herein, we affirm the convictions of appellants José Samuel Forty–Estremera and William Romero–Lewis. We remand the case of appellant Victor Levy–Cordero for further findings in accordance with this opinion.

## BACKGROUND

The facts as the jury could have found them are as follows. Angel Rosa–Collazo ("Rosa–Collazo") and Jesús Manuel Forty–Estremera ("Manolo Forty"), who is the brother of appellant José Samuel Forty–Estremera ("Forty–Estremera"), were the leaders of a large conspiracy to import and distribute marijuana and cocaine in Puerto Rico

between March 1987 and November 1990.[1] In early 1987, Rosa–Collazo, Manolo Forty, Forty–Estremera, and a co-conspirator named César Castro–Gómez ("Castro–Gómez"), agreed to import a load of marijuana from Colombia to Puerto Rico. Rosa–Collazo arranged for a Colombian supplier to provide the marijuana. Castro–Gómez recruited appellant Victor Levy–Cordero ("Levy–Cordero"), who owned a boat that could be used to off-load the marijuana from the Colombian mothership. On March 7, 1987, Forty–Estremera and other co-conspirators rented a house near Naguabo, Puerto Rico for stashing the drugs. Over the course of three days, sometime in the weeks following the rental of the stash house,[2] various members of the conspiracy, including Levy–Cordero, Castro–Gómez, and Manolo Forty, off-loaded 5,000 pounds of marijuana from the Colombian ship and brought it to the beach near the stash house. Forty–Estremera helped supervise a crew of about eight men who took the marijuana from the beach to the stash house. Forty–Estremera was responsible for paying the men.

In April 1988, Rosa–Collazo coordinated the importation of approximately 5,000 pounds of marijuana from Colombia. Forty–Estremera supervised a crew of men off-loading the marijuana on the beach near Humacao, Puerto Rico. The marijuana was then transported to and stashed at the home of co-conspirator Miles Johnson ("Johnson").[3] The marijuana was then distributed from Johnson's home.

In May 1988, Rosa–Collazo and Manolo Forty directed several co-conspirators in the importation of approximately 300 kilograms of cocaine from Colombia to Puerto Rico. Rosa–Collazo paid Forty–Estremera $60,000 to store the cocaine at his home for several hours. The conspirators imported two more loads of cocaine in September 1988, one load in October 1988, one load in November 1988, a load in March 1989, another in April 1989, three loads in May 1989, and one load in November 1990. In addition, there were unsuccessful attempts to import cocaine in September 1988 and March 30, 1990. In total, the conspiracy imported over 7,000 kilograms of cocaine during this period.

The cocaine was usually imported from Colombia. The operating procedure, which varied only slightly, was as follows. Rosa–Collazo would speak to his mostly Colombian suppliers via radio and arrange the logistics of the transactions. A group of co-conspirators, usually led by Manolo Forty, would either meet a Colombian mothership at sea or pick up cocaine dropped from a plane, and load the cocaine onto small boats. They would then bring the load of cocaine near the shore, where it would be transferred to a small raft and brought to the beach. A group of co-conspirators, usually supervised by Forty–Estremera, would be waiting on the beach to off-load the cocaine and transport it by car or truck to a pre-arranged stash house. The cocaine was occasionally stored at the homes of Johnson or Forty–Estremera. The cocaine would then be distributed from the stash house. Members of the conspiracy were paid in cash or cocaine.

After a twenty-day trial, Forty–Estremera was convicted of one count of conspiracy, two counts of importing marijuana, two counts of possessing marijuana with intent to distribute, ten counts of importing cocaine, ten counts of possessing cocaine with intent to distribute, and one count of attempting to import cocaine. Romero–Lewis was convicted of one count of conspiracy, two counts of importing cocaine, two counts of possessing cocaine with intent to distribute, and one count of attempting to import cocaine.

---

1. Rosa–Collazo, who was living in Florida as a fugitive from justice during the pendency of the conspiracy, entered into a plea agreement with the government and was the central witness against appellants in this case. He pled guilty to operating a continuing criminal enterprise, in violation of 21 U.S.C. § 848, and was sentenced to 12 years in prison. Manolo Forty, also charged with operating a continuing criminal enterprise, is a fugitive from justice.

2. The exact date of the marijuana importation was a subject of dispute at trial, and continues as such on appeal. *See infra.*

3. Johnson entered a plea agreement and testified at trial for the government. He testified that his friend Forty–Estremera, along with Rosa–Collazo, approached him about using his house to stash the drugs.

Levy–Cordero was convicted of one count of conspiracy, one count of importing marijuana, and one count of possessing marijuana with intent to distribute.[4]

## DISCUSSION

Appellants challenge their convictions on several grounds. We address these issues seriatim.

### I. Severance

■■■ Romero–Lewis and Levy–Cordero argue that the district court abused its discretion in refusing to grant their motions, pursuant to Fed.R.Crim.P. 14, to sever their respective trials from that of Forty–Estremera. We begin our analysis of this issue with the maxim that persons who are indicted together should generally be tried together. *See United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir.1993) (citations omitted). "We reverse the decision to deny a motion for severance only upon a showing of strong prejudice, demonstrating a manifest abuse of discretion that deprived the defendant of a fair trial." *United States v. DeMasi*, 40 F.3d 1306, 1312 (1st Cir.1994) (quoting *United States v. Nason*, 9 F.3d 155, 158 (1st Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1331, 127 L.Ed.2d 678 (1994)).[5] When severance is denied, appellants bear the burden of proving "prejudice greater than that which necessarily inheres whenever multiple defendants . . . are jointly tried." *United States v. Diallo*, 29 F.3d 23, 27 (1st Cir.1994) (quoting *United States v. Walker*, 706 F.2d 28, 30 (1st Cir.1983)). In this context, "prejudice means more than just a better chance of acquittal at a separate trial." *Id.* (quoting *United States v. Boylan*, 898 F.2d 230, 246 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990)).

■ Romero–Lewis and Levy–Cordero contend that they were prejudiced by the volume of evidence presented against Forty–Estremera. Romero–Lewis notes that the government alleged only that he served as a boat captain in two shipments of cocaine. He contends that the evidence of his co-conspirators importing and distributing marijuana and cocaine in a similar manner prevented the jury from considering the evidence against him independently. He also contends that this prejudice was compounded by the district court's decision to allow evidence of his co-conspirators' participation in unrelated drug trafficking pursuant to Fed. R.Evid. 404(b). Similarly, Levy–Cordero argues that a "miniscule" percentage of the total evidence presented in the case related to him. He also argues that admission of Rule 404(b) evidence relating to him "further contributed to the blending of the issues and the danger that the jury would not sort through the evidence properly."

It is true that much of the evidence in this case was directed primarily at Forty–Estremera, but this factor alone is not grounds for reversal. As we have explained, the mere fact that a "minnow" stands trial with a "kingfish," and the government aims most of its ammunition at the kingfish, does not, without more, necessitate separate trials. *O'Bryant*, 998 F.2d at 26. "It is well settled that '[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others,' the court of appeals must be 'reluctant to second guess severance denials.'" *DeMasi*, 40 F.3d at 1313 (quoting *O'Bryant*, 998 F.2d at 26).

Moreover, the indictment alleged that all three appellants were members of the four-year conspiracy to import drugs. The majority of the evidence introduced against Forty–

---

**4.** Forty–Estremera was sentenced to concurrent terms of life imprisonment for each count of conviction. Romero–Lewis was sentenced to concurrent twenty-year terms of imprisonment for each count of conviction. Levy–Cordero was sentenced to concurrent twenty-year terms of imprisonment for each count of conviction.

**5.** This extremely deferential standard of review follows from the Supreme Court's recent admon-

ishment that "a district court should grant a severance motion under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).

Estremera to establish the conspiracy, therefore, would have been admissible in separate trials against Romero–Lewis and Levy–Cordero to establish the existence of the conspiracy. As we have previously explained, "[w]here evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." *O'Bryant*, 998 F.2d at 26 (collecting cases). We also note that the trial judge in this case gave appropriate limiting instructions concerning the admissibility of evidence against particular defendants, and the need to determine guilt on an individual basis.

■ To prevail on a claim of prejudicial spillover, a defendant "must prove prejudice so pervasive that a miscarriage of justice looms." *United States v. Pierro*, 32 F.3d 611, 615 (1st Cir.1994) (citations omitted). Because neither Romero–Lewis nor Levy–Cordero have satisfied this burden, we affirm the denial of their respective motions to sever.

## II. *Prosecutorial Misconduct*

All three appellants argue that certain comments made by the prosecutor during closing argument denied them their rights to a fair trial. The prosecutor made the following remarks near the end of the government's closing argument:

> Ladies and gentlemen, I used to sing a hymn when I was growing up that was— came from, I believe, Russell Lowe, and it goes something like: Once to every man in nation comes the moment to decide on the side of the truth or falsehood. On the good or evil side.
>
> I submit to you all thirty-nine of these Counts—all three of these defendants agreed to take part of the conspiracy to smuggle drugs into Puerto Rico show the evil. And I submit to you that when the defendants pled guilty and decided to cooperate and come in here and tell you ladies and gentlemen what happened, those cooperating defendants for the first

time decided to tell the truth and they showed to the side of the truth.

■ These remarks were obviously improper. First, they constitute improper witness-vouching by the prosecution. *See United States v. Manning*, 23 F.3d 570, 573 (1st Cir.1994) (improper for prosecutor to vouch for credibility of government witness) (collecting cases). Second, by conjuring up images of religion, the remarks improperly appeal to the jury to act in ways other than as dispassionate arbiters of the facts. *See id. See also Arrieta–Agressot v. United States*, 3 F.3d 525, 527 (1st Cir.1993); *United States v. Giry*, 818 F.2d 120, 133 (1st Cir.1987). We will reverse a conviction on the grounds of a prosecutor's improper jury argument, however, only if we find that the prosecutor's remarks were *both* inappropriate *and* harmful. *See United States v. Ovalle–Márquez*, 36 F.3d 212, 220 (1st Cir.1994) (citing *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985)).[6] We must therefore determine whether these improper remarks were harmful.

■ Improper statements during closing argument are considered harmful if, under the totality of the circumstances, they likely affected the trial's outcome. *See Manning*, 23 F.3d at 574; *United States v. Hodge–Balwing*, 952 F.2d 607, 610 (1st Cir. 1991); *United States v. Capone*, 683 F.2d 582, 586–87 (1st Cir.1982). In making this determination, we focus particular attention on (1) the severity of the misconduct; (2) whether it was deliberate or accidental; (3) the context in which it occurred; (4) the likely effect of any curative instructions; and (5) the strength of the evidence against the defendant. *Manning*, 23 F.3d at 574; *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir.1993).

■ In this case, the relevant factors cut both ways. Several factors weigh towards a finding of harmfulness. First, the remarks were plainly deliberate—most likely they were part of a scripted argument prepared in

---

6. The parties agreed, prior to trial, that they would not object during opening and closing arguments. Counsel for Levy–Cordero moved for a mistrial based on the prosecutor's remarks immediately after the government's closing argument. Counsel for the other appellants joined in that motion. Under these circumstances, the issue is properly preserved for appeal.

advance by the prosecutor. Second, the improper argument was made at the very end of the government's summation. As we have previously observed, this is "an especially delicate point in the trial process [because it] represent[s] the parties' last, best chance to marshal the evidence and persuade the jurors of its import." *United States v. Taylor*, 54 F.3d 967, 977 (1st Cir.1995). Finally, the court did not provide a curative instruction to mitigate the impact of the improper comments.[7]

We think those factors are outweighed, however, by those militating against a finding of harmfulness. First, our review of the record indicates that this was an isolated incident of misconduct during the course of a twenty day trial. *Cf. Manning*, 23 F.3d at 575 (prosecutorial overreaching was "pervasive"). Second, we do not think that these isolated remarks were particularly persuasive, and they were not delivered in a particularly artful manner. While we think the remarks were intended to appeal to the jurors' passions and emotions, we do not think they were of a caliber that would inherently compel jurors to disregard their duty. *Cf. United States v. Machor*, 879 F.2d 945, 955–56 (1st Cir.1989) (affirming drug convictions where prosecutor appealed to jury to convict because, among other improper reasons, drugs are "poisoning our community, and our kids die because of this"). Third, we think the evidence against the appellants was sufficiently strong that these isolated, and relatively tame remarks would not likely affect the outcome of the case. *Cf. United States v. Sepúlveda*, 15 F.3d 1161, 1188 (1st Cir.1993) (considering the strength of the evidence, improbable that "isolated, relatively subdued appeal for law enforcement" affected outcome of trial).

Finally, we note that, although the court did not provide an explicit curative instruction, its instructions to the jury at the close of argument were strong and clear. The court instructed the jury that "it is your duty to base your verdict solely upon the testimony and evidence in the case, without prejudice or sympathy." The court also stated that "any statements, objections or arguments made by the lawyers are not evidence in the case" and that "[y]ou are the sole judges of the credibility or believability of each witness." With respect to the testimony of the codefendants who reached plea agreements with the government, the court stated: "[Y]ou should keep in mind that such testimony is always to be received with great caution and weighed with great care. You never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that accomplice's testimony beyond a reasonable doubt...." The court also provided clear and comprehensive instructions concerning the separate elements of conspiracy. On balance, we think these instructions likely mitigated any impact the prosecutor's improper remarks might have had. *Cf. Giry*, 818 F.2d at 133 (noting that similar instructions "significantly reduced the prejudicial impact of the prosecutor's misstatements").

For the foregoing reasons, we conclude that the improper remarks were not so prejudicial as to require reversal. Notwithstanding our decision in this regard, we repeat our concern that, "after numerous warnings from this court, the prosecuting attorneys in the District of Puerto Rico persist in spiking their arguments with comments that put their cases at risk." *United States v. Ortiz–Arrigoitia*, 996 F.2d 436, 441 (1st Cir.1993) (collecting cases). *See, e.g., Udechukwu*, 11 F.3d 1101; *Arrieta–Agressot*, 3 F.3d 525. When, as in this case, a visiting Justice Department prosecutor conducts the trial, we nevertheless expect the resident United States Attorney to insure that the expectations of the court concerning closing argument be made known.

### III. *The Rule 404(b) Evidence*

■ Forty–Estremera and Levy–Cordero both challenge the admission, pursuant to Fed.R.Evid. 404(b), of certain evidence

---

7. We note that the motion for mistrial and request for a curative instruction, and the court's denial of both, took place outside the presence of the jury. Thus, the improper remarks were not tacitly approved by the judge in front of the jury.

*Cf. Manning*, 23 F.3d at 575 (district court tacitly indicated that the prosecutor's improper arguments were proper by overruling defense counsel's contemporaneous objections).

against them at trial. Under Rule 404(b), evidence of a defendant's prior bad acts is not admissible if the only relevance of the evidence is to "instigate an inference that the defendant is more likely to have acted in similar fashion by committing the offense for which he is on trial." *United States v. Tutiven*, 40 F.3d 1, 5 (1st Cir.1994). Although prior bad act evidence is inadmissible if it only shows bad character or propensity to commit a crime, it may be admitted if it tends to prove, among other things, the defendant's motive, intent, knowledge or plan with respect to the crime at issue, and its probative value is not substantially outweighed by the danger of unfair prejudice. *See United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir.1993) (citations omitted); *United States v. Arias–Montoya*, 967 F.2d 708, 709 (1st Cir.1992).

### A. Forty–Estremera's Prior Drug Trafficking.

On cross-examination, counsel for Levy–Cordero asked cooperating co-conspirator Frank Martone a series of questions about his admitted involvement in flying drugs into Puerto Rico in the early 1980s. After counsel asked Martone if he ever used a co-pilot, and Martone answered in the affirmative, the following colloquy ensued.

> COUNSEL: How many co-pilots did you have with the Rosa gang? Give me a number first.
>
> MARTONE: Three.
>
> COUNSEL: I bet you're going to say Sammy Forty [Estremera] was one of them aren't you?
>
> MARTONE: Sammy flew with me about three or four times.

Counsel for Forty–Estremera neither objected to this testimony nor requested a limiting instruction.

The prosecutor returned to this issue on redirect, asking Martone how many trips Forty–Estremera made as his co-pilot. Counsel for Forty–Estremera objected on relevancy grounds and the district court overruled his objection. The prosecutor then elicited from Martone that Forty–Estremera flew as his co-pilot three times to Colombia and once to Jamaica for the purposes of importing marijuana to Puerto Rico. Martone also testified that the marijuana was usually airdropped to waiting boats, and one time it was off-loaded on Virgin Gorda. He also testified that he and Forty–Estremera were paid to transport the drugs. Forty–Estremera now challenges the admission of this testimony.

Under the circumstances of this case, we need not decide whether the district court erred in allowing Martone to testify about Forty–Estremera's prior drug trafficking activities because we conclude that, even assuming that the court erred, any such error was harmless. *Arias–Montoya*, 967 F.2d at 714; Fed.R.Crim.P. 52 (any error which does not "affect substantial rights shall be disregarded").

We treat nonconstitutional evidentiary errors under Rule 404(b) as harmless if we conclude that it is "highly probable" that the error did not contribute to the verdict. *Arias–Montoya*, 967 F.2d at 714 (quoting *United States v. García–Rosa*, 876 F.2d 209, 221 (1st Cir.1989)). We think it highly unlikely that Martone's testimony on cross-examination affected the verdict. First of all, we note that the government's main witness, cooperating co-conspirator Rosa–Collazo, had already alluded generally to the fact that he and Forty–Estremera had long been involved in drug smuggling.[8] The fact that the jury had already heard about Forty–Estremera's alleged prior drug trafficking activities, without any objection, decreases the chances that the improper admission of Martone's statement caused much additional prejudice. Considering what the jury had already heard about Forty–Estremera, Martone's testimony must have come as no surprise. Second, as described herein, the government's case against Forty–Estremera, in-

---

8. For example, Rosa–Collazo testified: "And eventually [Forty–Estremera] came forward to me and told me that they were broke, since we been two years since we haven't work and didn't make money in drugs, you know, making drug deals, in smuggling drugs like we used to, and that we needed to get together to see if we can make any other load or some kind of business again."

dependent of the bad act evidence, was very strong. We therefore conclude that admission of that testimony on cross-examination was harmless.

The above analysis applies with equal force to the testimony elicited on re-direct by the government. In addition, we note that, because the prejudicial testimony in question had already been elicited by counsel for Levy–Cordero, without objection from Forty–Estremera, the cat was already substantially out of the bag. Moreover, the few additional details elicited from the prosecutor were not particularly prejudicial in and of themselves. The most significant information was provided on cross-examination—that Forty–Estremera had previously been involved in drug trafficking.[9]

### B. *Levy–Cordero's False Identification Documents*

Levy–Cordero argues that the district court erred in admitting into evidence, pursuant Rule 404(b), a false passport and social security card seized from him at the time of his arrest in June 1992. Prior to Levy–Cordero's arrest, a Special Agent of the Drug Enforcement Agency had a secretary telephone Levy–Cordero, identify herself as the office manager of his apartment, and inform him that the police were coming that day to arrest him. Immediately after the call was made, Levy–Cordero emerged from his apartment with a briefcase containing a false passport, false social security card, a pager, cellular telephone, $1,200 in cash, and other documents. Although Levy–Cordero did not object at trial to the admission of evidence that he fled when notified of his impending arrest, he objected to admission of the items in the brief case. On appeal, he challenges only admission of the fake passport and social security card.

After a hearing, the district court ruled that "the passport [was] relevant and probative to the issue of the defendant's consciousness of guilt and, therefore, admissible under Rule 404(b)." Levy–Cordero requested a limiting instruction that the documents were

being admitted solely on the issue of consciousness of guilt. The court agreed to give such an instruction, but instead informed the jury that it could consider the evidence "only for the limited purpose of showing whether [Levy] had the required intent or knowledge to commit the offense charged in this case."

 We think the evidence in question was properly admissible under Rule 404(b) to show consciousness of guilt, but that the court erred in instructing the jury that it could be used to show appellant's intent or knowledge of the charged offenses. We conclude, however, that the erroneous limiting instruction was harmless. Indeed, we think the error was more favorable to the defendant than a consciousness of guilt instruction. This is so because there is no logical reason why possession of a false passport and social security card in 1992 would demonstrate appellant's intent or knowledge with respect to drug trafficking offenses in 1987. Thus, the court instructed the jury that it could draw an inference that the evidence could not logically support. In contrast, the evidence does logically support an inference of consciousness of guilt. Under such circumstances, we find no error in the admission of the false identification evidence, and conclude that the erroneous limiting instruction was harmless.

### IV. *Exclusion of Alibi Evidence*

#### A. *Levy–Cordero*

Levy–Cordero argues that his Sixth Amendment right to present witnesses in his defense was violated when the district court denied his mid-trial, emergency motion to present alibi evidence. The district court excluded the proffered alibi evidence as a sanction for what it described as defense counsel's willful violation of the court's discovery order requiring pre-trial notice of intent to offer an alibi defense.

The facts and allegations relevant to this issue are as follows. The indictment alleges that Levy–Cordero was involved in the importation of a 5,000–pound load of marijuana

---

9. Our decision that admission of this evidence was harmless moots Forty–Estremera's argument that the evidence should have been excluded because the government's intention to use such Rule 404(b) evidence was lately notified to defense counsel.

which arrived in Puerto Rico "[d]uring several days in March or April of 1987." The government provided defense counsel with a letter prior to trial stating that "the load of marijuana was imported into Puerto Rico three weeks after the co-conspirators were in possession of the [stash] house." The government indicated that the stash house was rented between March 7th and 10th, but was unclear as to when the co-conspirators actually took possession. In addition, in response to inquiries from defense counsel, the government indicated, at one point, that the load arrived at "the end of March 1987," and, at another point, that it arrived no earlier than March 22 or 24, 1987.

On November 20, 1992, the government's first witness at trial, Rosa–Collazo, testified that the load arrived three weeks after the rental of the stash house by the co-conspirators. On November 30, 1992, co-conspirator Johnson testified that the load arrived a *"week or two" after the house was rented,* and that it was off-loaded over the course of a Friday, Saturday and Sunday. On December 1, the owner of the rental house, Julia Toro–May ("Toro–May") testified that the house was rented on March 7, 1987, and that she mailed the keys to the house on March 8th (a Sunday).

Levy–Cordero maintains that the testimony of Johnson and Toro–May suggests a new time frame for the arrival of the marijuana at the stash house. He argues that the load could have arrived on the weekends of March 13–15, 1987,[10] or March 20–22, 1987, which are earlier than the dates indicated by the government before trial. Levy–Cordero maintains that after he heard this testimony he began to "piece together his memory regarding his whereabouts five years earlier," and eventually recalled that he had made a trip to Gainesville, Florida to attend the National Hot Rod Association Gator Nationals car races during the weekend of March 20–22, 1987. He also remembered that co-defendant Castro–Gómez had purchased a new BMW in Florida that same weekend. Levy–Cordero's counsel visited Castro–Gómez in

prison to confirm the dates that he travelled to Florida to purchase the car. Levy–Cordero also recalled that, although he was scheduled to return to Puerto Rico on March 23, he stayed in Miami because his brother was arrested for driving under the influence of alcohol, and he did not return to Puerto Rico until the 28th or 29th of March.

Levy–Cordero's counsel notified the court on December 3, 1992, that he was investigating a possible alibi defense. On December 7, 1992, Levy–Cordero filed an emergency motion to present alibi evidence that he was in Florida from March 19, 1987 through March 28–29, 1987, and therefore could not have assisted in the importation of the marijuana in Puerto Rico. In support of his alibi defense, Levy–Cordero listed six witnesses and extensive documentary evidence, including travel agency records, bank card charge records, photographs, his brother's arrest record, and Castro–Gómez' car purchase records. After a hearing, the district court denied the motion to present alibi evidence. The district court concluded that counsel's failure to disclose the alibi defense earlier was "willful and motivated by a desire to gain a tactical advantage" at trial. *United States v. Levy–Cordero,* 833 F.Supp. 938, 945 (D.P.R.1993) (quoting *Taylor v. Illinois,* 484 U.S. 400, 415, 108 S.Ct. 646, 656, 98 L.Ed.2d 798 (1988)). The court excluded the alibi evidence as a sanction for counsel's deliberate violation of a court discovery order.

Levy–Cordero argues that exclusion of the alibi evidence violated his Sixth Amendment right to present witnesses in his favor. The Compulsory Process Clause of the Sixth Amendment guarantees every defendant "the right ... to have compulsory process for obtaining witnesses in his favor...." The clause thus provides criminal defendants the right to present witnesses and evidence in their defense. *See Taylor,* 484 U.S. at 408, 108 S.Ct. at 652–53; *Chappee v. Vose,* 843 F.2d 25, 28 (1st Cir.1988). Although this right is fundamental, it is not

---

**10.** The jury implicitly rejected these three dates as the possible dates of the importation by rejecting appellant's claim that the statute of limitations had run on the offenses charged in the

superseding indictment. Any acts prior to March 20, 1987, would have been beyond the statute of limitations.

absolute, and must be weighed against countervailing public interests. *Taylor*, 484 U.S. at 414, 108 S.Ct. at 655–56. The factors to consider in the balance include the "integrity of the adversary process, which depends both upon the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 414–15, 108 S.Ct. at 656. The trial court can properly exclude alibi testimony if these factors outweigh the defendant's interest in presenting the testimony. *Bowling v. Vose*, 3 F.3d 559, 561 (1st Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1236, 127 L.Ed.2d 580 (1994). Moreover, if the court determines that counsel's delay in providing timely notice of an alibi defense "was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," exclusion is "entirely consistent" with the purposes of the Compulsory Process Clause. *Taylor*, 484 U.S. at 415, 108 S.Ct. at 656.

▪ Application of the *Taylor* factors is a legal question which we review *de novo*. *Bowling*, 3 F.3d at 561 n. 4. The district court's specific finding of willfulness, however, is more akin to a finding of fact than a legal conclusion. The determination depends primarily on whether the district court accepts or rejects counsel's explanation as to why he could not provide notice of the alibi defense in a timely manner. *See Taylor*, 484 U.S. at 415, 108 S.Ct. at 656 (trial judge may insist on and evaluate party's explanation for its failure to provide timely notice of alibi defense). The decision therefore hinges upon whether that explanation is credible, given the surrounding factual circumstances of the case. Such a factual determination merits considerable deference. Nevertheless, after carefully reviewing the record, we conclude that the district court's decision lacks record support.

▪ The district court relied on the following factors in support of its conclusion that counsel's failure to provide notice of an alibi defense in a more timely fashion was a willful attempt to gain tactical advantage at trial. First, the court noted that, when first asked why he did not investigate an alibi for March before trial, counsel for Levy–Cordero stated that he was misled by the government to believe that the alleged importation took place in April. The court rejected this explanation, noting that the government's response to counsel's motion for bill of particulars stated that the importation took place "[n]o earlier than March 22 ... or March 24, 1987," and that counsel had a copy of a letter the government sent to Castro–Gómez' counsel prior to trial stating that the load arrived "at the end of March 1987." [11]

The court is certainly correct that these letters put counsel on notice to investigate any possible alibi defense for *later than March 22.* The fact remains, however, that the dates provided by the government exclude the possibility that the drugs were imported on the weekend of March 20–22— precisely the dates that the jury could have concluded the drugs arrived in Puerto Rico if they believed Johnson's testimony. Although counsel's statement that the government "misled" him into believing the marijuana was imported in April 1987 is not supported by the record, we discern no malicious intent from the statement. The fact is that the time frame provided by the government prior to trial was changed at trial by the testimony of *a government witness,* Johnson. *Cf. Bowling*, 3 F.3d at 560.

Defense counsel was entitled to rely on the government's representations prior to trial, particularly in light of the fact that the allegations in the superseding indictment occurred more than five years prior to appellant's arrest, making investigation of a possible alibi exceedingly difficult. In *Bowling*, we concluded that counsel's failure to investigate an alibi for a time which was expressly excluded by the government's time frame

**11.** This letter also states that the load came in three weeks after the co-conspirators took possession of the stash house. The evidence indicates that they took possession of the stash house at least a few days after March 8. Three weeks after March 10th is April 1st. Thus, the letter actually contains two contradictory statements.

before trial, although it was close in proximity to that time frame, was "negligence at worst." 3 F.3d at 562. On balance, we think the facts of this case are much closer to *Bowling* than they are to *Taylor*, the case relied on by the district court, where the evidence indicated that counsel had interviewed an exculpatory witness a week before trial and flat-out lied in telling the court that he had just discovered the witness. *See Taylor*, 484 U.S. at 416–17, 108 S.Ct. at 656–57.

Second, the district court pointed out several apparent contradictions in counsel's chronology of the events leading to the discovery of the alibi. These contradictions are fully delineated in the district court opinion, 833 F.Supp. at 942–43, and will not be repeated here. The court concluded from these contradictions that counsel was investigating the potential alibi defense as early as November 20, 1992. Noting counsel's duty to immediately inform the court of the possibility that it might present an alibi defense, the court concluded that counsel's failure to do so represented a deliberate ploy to ambush the government. *Id.* at 946.

We think there are two problems with this conclusion. First, counsel was providing the government, if not the court, with all documentation and subpoena information with respect to its possible alibi investigation as that evidence was received. Second, and most importantly, we do not think the record is clear with respect to whether counsel was ever ordered to provide notice of its intention to present an alibi defense. As to this latter point, some background is necessary.

A defendant's duty to provide notice of an alibi defense is triggered when the government issues a written demand pursuant to Rule 12.1(a) of the Federal Rules of Criminal Procedure.[12] In its initial opinion denying Levy–Cordero's emergency motion to present alibi evidence, the court mistakenly ruled that Levy–Cordero had not complied with Rule 12.1(a). In fact, the government never issued a Rule 12.1(a) demand to Levy–Cordero. After counsel informed the court of this

fact, the court ruled that Levy–Cordero had failed to comply with the court's October 15, 1987, discovery order ("Omnibus Order No. 7").

Omnibus Order No. 7 provides: "[A]ll those defendants intending to offer an alibi defense shall serve the Rule 12.1(a) Fed. R.Crim.P. Notice of Alibi upon the Government no later than October 26, 1992. The Government's disclosure pursuant to Rule 12.1(b) ... shall be served upon defendants no later than November 10, 1992." Prior to this order, the government had issued Rule 12.1(a) written demands for notice of alibi defenses to two of the defendants in this case, but not to Levy–Cordero. At the hearing on October 15, those defendants requested an extension of the ten days required under Rule 12.1 to respond to the written demand. Counsel for Levy–Cordero did not participate in the ensuing discussion because the government had not served a written demand upon his client. The district court's order specifically refers to "the Rule 12.1(a) ... Notice of Alibi." On its face, this order refers only to those defendants who have already received a written demand from the government, and appears to be in direct response to the request for an extension to respond to the written demand. Under these circumstances, we think counsel's conclusion that he was not required to immediately disclose the fact that he was investigating a possible alibi defense was not wholly unreasonable.

The district court's balancing of the remaining *Taylor* factors depended almost entirely on its predicate willfulness finding. We have weighed the *Taylor* factors in light of our determination that counsel did not engage in willful misconduct, and conclude that appellant's Sixth Amendment right to present witnesses in his defense outweigh those concerns. Specifically, we note that neither the integrity of the adversary process nor its truth-seeking function is threatened by introduction of the alibi evidence. The court made no specific findings with respect

12. Rule 12.1(a) provides: "Upon written demand by the attorney for the government stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such time as the court may direct, upon the attorney for the government a written notice of intention of the defendant's intention to offer a defense of alibi."

to the reliability of the proposed alibi evidence. Rather, the court simply stated that " '[g]iven the ease with which an alibi can be fabricated' we became suspicious of the large number of documents, evidence and defense witnesses who had not been identified until after the eleventh hour." 833 F.Supp. at 946 (quoting *Williams v. Florida,* 399 U.S. 78, 81, 90 S.Ct. 1893, 1895–96, 26 L.Ed.2d 446 (1970)). The district court provides no justification, however, for its conclusion that the " 'truth-determining function' of the trial process was at risk." *Id.* While a court may rightfully become suspicious where an "eleventh hour" alibi is so thoroughly documented, it cannot, without more, simply conclude that the alibi was therefore fabricated.[13] In this respect, we note that the district court states that the only piece of "direct evidence" corroborating defendant's presence in Florida during March 1987 was a non-refundable round trip ticket from San Juan to Orlando departing March 19 and returning March 23. *Id.* at 946 n. 37. This statement is simply inaccurate. In fact, counsel offered the sworn testimony of at least six witnesses who were prepared to testify that they were with Levy–Cordero in Florida in March 1987.

The district court's opinion in this matter is detailed and comprehensive. Nevertheless, although it is a close call, we think that under the unusual facts of this case—particularly the justifiable confusion concerning the discovery order—the court should have held a preliminary hearing to evaluate the content and reliability of the proposed alibi evidence.

*Cf. Taylor,* 484 U.S. at 404–405, 108 S.Ct. at 650–651 (defense counsel was permitted to make an offer of proof in the form of the alibi witness's testimony outside the presence of the jury). Only after such a hearing, where the court has the opportunity to evaluate the testimony of the alleged alibi witnesses, can a finding of "fabrication" be fully justified. In addition, for the reasons discussed herein, the court should revisit its original willfulness determination and make further factual findings consistent with this opinion.

■ Exclusion of potentially exculpatory alibi evidence is the most severe of discovery sanctions. Because of the extreme consequences of exclusion—including the implication on defendant's Sixth Amendment rights—we conclude that the district court should have held a hearing outside the presence of the jury in which defense counsel was permitted to present the proposed alibi testimony for the court to evaluate it both for content and reliability.[14] At the hearing, the court should also revisit the willfulness issue and make any further findings consistent with this opinion. We remand Levy–Cordero's case to the district court for a hearing and further factual findings consistent with this opinion.[15]

### B. *Forty–Estremera*

The government stipulated at trial that Forty–Estremera operated and partially owned a legitimate business, Palmetto Film

---

13. In contrast to the district court in *Taylor, see* 484 U.S. at 404–405, 108 S.Ct. at 650–651, the court in this case did not permit defense counsel to make an offer of proof in the form of the proposed testimony by the alleged alibi witness outside the presence of the jury. Thus, there is no record basis for its implicit conclusion that the testimony was fabricated.

14. We note in this context, that the proposed testimony appears irrelevant if it does not place Levy–Cordero in Florida on the weekend of March 20–22.

15. The district court's failure to hold an evidentiary hearing Levy–Cordero's proposed alibi evidence was not "harmless beyond a reasonable doubt" because there is a "reasonable possibility" that exclusion of the proffered alibi evidence influenced the jury's verdict. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17

L.Ed.2d 705 (1966); *United States v. de Jesús–Ríos,* 990 F.2d 672, 678 (1st Cir.1993); *United States v. Maraj,* 947 F.2d 520, 526 n. 8 (1st Cir.1991). If believed by the jury, the proffered alibi evidence could have shown that Levy–Cordero was in Florida for a weekend when a government witness testified that the importation may have occurred. Moreover, the inculpatory evidence against Levy–Cordero consisted almost entirely of the testimony of two co-conspirators to the effect that Levy–Cordero participated in the March 1987 marijuana importation, and Levy–Cordero was not convicted of any of the other substantive offenses. While this testimony is sufficient to sustain Levy–Cordero's conviction, and we therefore reject his challenge to the sufficiency of the evidence, if the alibi evidence was reliable and relevant to the pertinent time period, the jury may have considered it more persuasive than the testimony of two co-conspirators.

and Video Productions, Inc., which produced, edited and filmed television commercials and documentaries in Puerto Rico between 1986 and 1991. Forty–Estremera maintained at trial that he was too busy with his business to have committed the overt acts alleged in the superseding indictment. To this end, Forty–Estremera and several employees of his company testified concerning Forty–Estremera's involvement with projects undertaken by his film production company during the time frame in which he was allegedly committing the drug trafficking offenses. Forty–Estremera also introduced various documents pertaining to the business, including cancelled checks, lease agreements, promissory notes, tax returns, and invoices, many of which pertained to the relevant time periods in the indictment. In addition, Forty–Estremera moved to show a videotape depicting some of the advertising work allegedly produced by the company during the pertinent time periods. After a hearing, the district court determined that the videotape was irrelevant, and denied appellant's motion. Forty–Estremera appeals that decision.

■ In general, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is inadmissible." Fed.R.Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *United States v. Brandon,* 17 F.3d 409, 444 (1st Cir.1994). We review a district court's relevancy determinations for abuse of discretion. *Brandon,* 17 F.3d at 444.

■ We think the district court acted within its discretion in excluding the videotape. During the hearing on appellant's motion, counsel for the government informed the court that he had watched the video, and argued that the court should exclude the tape because it did not corroborate or summarize the testimony about the company, and because nothing in the tape corroborated Forty–Estremera's alibi for specific dates. In

response, Forty–Estremera's counsel stated only that the material shown in the tape was produced between 1987 and 1990. Without any specific dates, the tape did not make it more probable that Forty–Estremera was too busy with his business to participate in the alleged drug activities. Moreover, even if it could be said that the videotape had some marginal probative value, the district court could have reasonable excluded it on the grounds that its probative value was substantially outweighed by considerations of waste of time. *See* Fed.R.Evid. 403 (authorizing exclusion of relevant evidence "if its probative value is substantially outweighed by ... considerations of waste of time").[16] Accordingly, we affirm the district court's exclusion of the videotape.

## V. *Alleged Juror Misconduct*

The record reflects that on at least three occasions various defense counsel complained about a particular juror talking with other jurors. Counsel were unable to say for sure that the juror was talking about the case, but speculated that she was. In addition, counsel for Forty–Estremera alleges that the same juror failed to disclose during *voir dire* that she had previously been married to an attorney in Puerto Rico. Prior to deliberations, counsel for Forty–Estremera requested that the juror be removed. Forty–Estremera now contends that juror misconduct unfairly prejudiced him at trial.

■ The district court "is vested with the discretion to fashion an appropriate and responsible procedure to determine whether [juror] misconduct actually occurred and whether it was prejudicial." *United States v. Ortiz–Arrigoitia,* 996 F.2d 436, 443 (1st Cir. 1993) (citing *United States v. Boylan,* 898 F.2d 230, 258 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990)). We review a determination that no misconduct occurred for "patent abuse of discretion." *United States v. Newman,* 982 F.2d 665, 670 (1st Cir.1992) (quoting *Boylan,* 898 F.2d at 258)).

---

**16.** It appears that this was an alternative reason that the district court denied the motion to play the video—the court twice stated during the

hearing that it did not want to waste time playing the video.

In response to the complaints about the juror, the court repeatedly admonished the jury not to discuss the facts of the case. The court's instructions were clear and forceful. In addition, after the first complaint, the judge stated that he would watch the juror closely. After the third incident the judge noted that he had been watching the juror and had not observed her talking to other jurors about the case. The judge stated that he would continue to watch the juror and would remove her for cause if he noticed any misconduct. We think this was a perfectly responsible and appropriate response by the court, particularly since counsel was unable to say that the juror was talking *about the case* with other jurors.

With respect to the allegations of nondisclosure, we have explained that a party seeking a new trial based on nondisclosure by a juror must "demonstrate actual prejudice or bias." *United States v. Aponte–Suárez,* 905 F.2d 483, 492 (1st Cir.1990). This "burden of proof must be sustained not as a matter of speculation, but as a demonstrable reality." *United States v. Vargas,* 606 F.2d 341, 344 (1st Cir.1979) (quoting *United States v. Whiting,* 538 F.2d 220, 223 (8th Cir.1976)). Forty–Estremera has utterly failed to sustain this burden. We find no grounds for disturbing the jury's verdict.

## VI. *Motions for New Trial*

### A. *Forty-Estremera's Second Motion for New Trial* [17]

A government witness, Lelio Rigaud ("Rigaud"), testified that he had worked on the rafts that transported cocaine from the boats to shore for three cocaine shipments in which Forty–Estremera was in charge of the ground crew. Rigaud identified Forty–Estremera at trial, although he had difficulty doing so. Forty–Estremera's motion for new trial, under Fed.R.Crim.P. 33, alleged that a deputy United States marshal told Forty–Estremera and Romero–Lewis that one of the prosecutors told him during a trial recess that he had shown Rigaud a picture of Forty–Estremera before Rigaud took the stand.

Prior to the evidentiary hearing on Forty–Estremera's motion for new trial, the court denied Forty–Estremera's request for a continuance to allow him to obtain the testimony of Romero–Lewis. At the subsequent evidentiary hearing, the district court heard testimony from Forty–Estremera, the marshal in question, and a government agent who had interviewed Rigaud during the investigation. The court subsequently denied the motion for new trial. Forty–Estremera argues on appeal that the court should have granted him a continuance to obtain the testimony of Romero–Lewis, who allegedly would have corroborated Forty–Estremera's version of events.

We will reverse a district court's denial of a motion for new trial only for manifest abuse of the district court's informed discretion. *United States v. Slade,* 980 F.2d 27, 29 (1st Cir.1992). The district court in this case determined that it did not require the testimony of Romero–Lewis in order to make an informed decision regarding Forty–Estremera's allegations. We find no abuse of discretion. Even if Romero–Lewis' testimony would have corroborated Forty–Estremera's version of events, it would have served only to further impeach Rigaud, whose identification of Forty–Estremera was shaky to begin with. Moreover, in the context of the trial as a whole, Rigaud was a minor witness against Forty–Estremera, and the independent evidence against Forty–Estremera was substantial. The district court did not abuse its discretion in concluding that, in all probability, the proffered new testimony would not have "result[ed] in an acquittal upon retrial" of Forty–Estremera. *See United States v. Natanel,* 938 F.2d 302, 313 (1st Cir.1991), *cert. denied,* 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992).

### B. *Forty–Estremera's Third Motion for New Trial*

Approximately one year and a half after trial, Forty–Estremera moved for a new trial

---

17. Forty–Estremera filed three motions for new trial. The first and second motions raise the same issue, but it is specifically the denial of the second motion from which he appeals. His third motion is addressed *infra.*

based on alleged newly discovered evidence. On appeal, Forty–Estremera contends that the district court abused its discretion in refusing to hold an evidentiary hearing and in denying the motion.

The facts relevant to this issue are as follows. The superseding indictment charged co-conspirator Castro–Gómez with one count of conspiracy to smuggle cocaine and marijuana into the United States and two counts of possession with intent to distribute 5,000 pounds of marijuana. In July 1992, Castro–Gómez entered a plea agreement with the government in which he agreed to plead guilty to the conspiracy count, and the government agreed to dismiss the possession counts. Castro–Gómez was subsequently sentenced to ten years in prison. In November 1992, just prior to commencement of trial, counsel for Forty–Estremera and counsel for Levy–Cordero visited Castro–Gómez and his attorney in prison. Under advice from counsel, Castro–Gómez allegedly informed appellants' counsel that he would not testify for any party at trial for fear of incriminating himself. He also allegedly stated that he would not testify on behalf of any defendant even if he was subpoenaed and threatened with sanctions.

On November 24, 1992, Castro–Gómez filed an informative motion with the district court telling the court of his desire not to testify, and noting his Fifth Amendment and Due Process concerns. None of the defendants attempted to subpoena Castro–Gómez or call him as a witness at trial. On July 11, 1994, Forty–Estremera filed a motion for new trial based on newly discovered evidence, consisting of two sworn affidavits by Castro–Gómez stating that Forty–Estremera was not one of the persons involved in the March 1987 importation of 5,000 pounds of marijuana.

■ This circuit uses a four-part test to evaluate a request for new trial based on newly discovered evidence. Under this test, the district court will grant a new trial only if it finds that: "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) the failure to learn of it was not a result of the defendant's poor diligence; (3) the new evidence is material; and (4) the

impact of the new evidence is so strong that an acquittal would probably result upon retrial." *Slade*, 980 F.2d at 29. The burden is upon the defendant to establish each of these requirements, and we review a district court's denial of a motion for new trial only for manifest abuse of discretion. *Id.*

■ Castro–Gómez' informative motion to the court states that he "begs the parties at this trial *not* to serve any subpoenas or call him to the witness stand." (emphasis in original). It also states that if he is called to the stand "he may self-incriminate as to probable pending indictments." And that he "may expose himself to a contempt predicament" if testifying would jeopardize his scheduled release from prison. Most notably, the motion concludes by requesting that the court protect him "from a trial's crossfire" and appoint counsel to "allow adequate time to advise defendant properly on any and all avenues available to him and of the possible legal consequences in this case *if he is forced to take the stand and testify . . . .*" (emphasis added).

As the district court noted, although Castro–Gómez' motion indicates that he is reluctant to testify, and that he desires protection from the court, it simply does not demonstrate that his testimony is unavailable. Indeed, the last sentence quoted above indicates that he anticipated being *forced* to take the stand and testify. Nevertheless, Forty–Estremera never sought to subpoena Castro–Gómez or compel him to testify. Under such circumstances, we conclude that the district court did not abuse its discretion in concluding that appellant failed to establish that Castro–Gómez' testimony was unknown or unavailable. We also note that appellant failed to establish that his failure to learn of the testimony was due to anything but his own lack of diligence. We therefore affirm the district court's denial of Forty–Estremera's motion for new trial.

### C. *Levy–Cordero's Motion for New Trial*

■ Levy–Cordero also filed a motion for new trial based on the testimony of Castro–Gómez. Levy–Cordero alleges that Castro–

Gómez also could have exculpated him by testifying that he was not involved in the March 1987 importation of marijuana. In addition, Levy–Cordero alleges that the reason Castro–Gómez did not testify was because the prosecutor had threatened to bring additional charges against Castro–Gómez if he exculpated Levy–Cordero. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (governmental interference with a witness may deprive a defendant of due process of law); *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir.1987).

"It is a bedrock rule that when a party has not presented an argument to the district court, [he] may not unveil it in the court of appeals." *United States v. Slade*, 980 F.2d 27, 30 (1st Cir.1992) (collecting cases). The only time Levy–Cordero raised the specter of witness tampering before the district court was in the most tangential of allusions in his reply to the government's opposition to his motion for new trial. At that time, counsel for Levy–Cordero stated that *during his preparation for trial* he interviewed Castro–Gómez who stated that he "was reluctant to testify in court for fear of damaging his 'good deal' and further fearing the 'wrath' of" the United States Attorney. Counsel also stated that Castro–Gómez had indicated that Levy–Cordero was involved in the load charged in the indictment. These vague allusions, which were not even accompanied by a contention that this constituted witness tampering, are not sufficient to preserve the issue for appeal. *Id.* ("Passing allusions are not adequate to preserve an argument in either a trial or an appellate venue."); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal citations and quotation marks omitted), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

Moreover, the reply brief indicates that counsel for Levy–Cordero possessed this information prior to trial. Notwithstanding his knowledge of these serious allegations prior to trial, counsel for Levy–Cordero never brought them to the attention of the district court prior to or during trial. Nor did he call Castro–Gómez as a witness. In addition, Castro–Gómez' informative motion provides no evidence of witness intimidation, and does not indicate that he would have refused to testify if called as a witness. Levy–Cordero had the information necessary to raise this before the district court. Because he failed to do so, and because no exceptional circumstances exist to excuse that failure, we deem the argument waived. *See Slade*, 980 F.2d at 30.

**VII.** *Sufficiency of the Evidence*

**A.** *Attempted Importation*

■ Romero–Lewis argues that the evidence is insufficient to sustain his conviction for attempting to import cocaine on March 30, 1990, because it establishes only a "preliminary plan" to import cocaine. "To prove a charge of attempt, the government must show beyond a reasonable doubt the defendant's intent to commit the offense charged and that the defendant performed a substantial step toward the commission of the offense." *DeMasi*, 40 F.3d at 1315 (citing *United States v. Argencourt*, 996 F.2d 1300, 1303 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 731, 126 L.Ed.2d 694 (1994)). This step must be " 'more than mere preparation' " but " 'less than the last act necessary before the actual commission of the substantive crime.' " *Argencourt*, 996 F.2d at 1303 (quoting *United States v. Chapdelaine*, 989 F.2d 28, 33 (1st Cir.1993)).

■ The evidence, presented in the light most favorable to the verdict, established the following. On the night of March 30, 1990, several co-conspirators were in their respective duty stations preparing to receive a load of cocaine which was to be dropped from a plane travelling from Colombia. Romero–Lewis was in a boat at sea waiting to assist in the off-loading of the cocaine. Eventually, Romero–Lewis contacted the other conspirators and informed them that the plane en route from Colombia was being followed, and would not be able to make the drop.

This evidence is clearly sufficient to support the inference that Romero–Lewis in-

tended to participate in the importation of the cocaine. It is also sufficient to show that the conspirators, including Romero–Lewis, had taken a substantial step to complete the importation. All systems were go, and all the conspirators were in their places waiting to complete the transaction. The evidence supports the inference that, if not for the suspected surveillance of the Colombian plane, the importation would have transpired as planned. We therefore find no basis for disturbing the jury's verdict on the attempted importation count.

## B. *Variance between Indictment and Proof*

Romero–Lewis argues that the evidence is insufficient to sustain his conviction for conspiracy to possess with intent to distribute more than 10,000 kilograms of cocaine and more than 1,000 kilograms of marijuana (Count 1). Appellant maintains that the evidence at trial proved the existence of two conspiracies, one to import and distribute marijuana and one to import and distribute cocaine. Because he was only directly implicated in the substantive offenses involving cocaine, Romero–Lewis contends that the jury could not properly convict him of any conspiracy that involved marijuana.

We review this claim to determine whether there is sufficient evidence to support the jury's verdict. *United v. Sepúlveda*, 15 F.3d 1161, 1191 (1st Cir.1993). We conclude that there was no material variance between the conspiracy charged and the conspiracy proven at trial. *See Boylan*, 898 F.2d at 246–47. The evidence at trial was sufficient for a rational jury to find the existence of a single conspiracy to import marijuana and cocaine, as alleged in the superseding indictment.

There was evidence at trial which, if believed, tended to show the following. The conspiracy extended over several years under the common leadership of Rosa–Collazo and Manolo Forty. The goal of the conspiracy remained constant—to import illegal narcotics into Puerto Rico for subsequent distribution. The operating procedure rarely varied. The illegal drugs were either air-dropped or the conspirators would meet a mothership at sea. The drugs would be brought near the shore by boat, and then usually transferred to shallow rafts and brought to shore. They would then be stored in a house pending distribution. Most members of the conspiracy participated in multiple importations. Moreover, the members had clearly defined roles with respect to the importations, and those remained relatively constant throughout the conspiracy. All these factors are important "indicia of unitariness." *Sepúlveda*, 15 F.3d at 1191. We find no basis for disturbing the jury's verdict.

## CONCLUSION

For the reasons stated herein, we *affirm* the convictions of José Samuel Forty–Estremera and William Romero–Lewis. We *remand* the case of Victor Levy–Cordero to the district court for a hearing and findings consistent with this opinion. We retain appellate jurisdiction over the case of Levy–Cordero, and direct the district court to report back to this court within 60 days on the status of the case.

COFFIN, Senior Circuit Judge (concurring).

I agree with the disposition of this appeal, but wish to express my view that certain of the court's observations with respect to the district court's exclusion of Levy–Cordero's alibi evidence are premature. In my view, further factual inquiry is necessary before we can evaluate the court's determinations regarding the seriousness of any government misleading, the unimportance of the contradictions in defense counsel's chronology of events leading to the supposed discovery of the alibi, and the absence of notice of discovery obligations. I therefore would await the results of the hearing that will be held on remand before commenting on the strength of the district court's willfulness finding.