**REL:**09/19/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

## 1121099

_____

### Ex parte State of Alabama

PETITION FOR WRIT OF CERTIORARI
TO THE COURT OF CRIMINAL APPEALS

(In re: Kevin Andre Towles

v.

State of Alabama)

(Etowah Circuit Court, CC-07-480;
Court of Criminal Appeals, CR-09-0396)

BOLIN, Justice.

1121099

Kevin Andre Towles was convicted of capital murder for killing his son, Geontae Glass, who was under the age of 14 when he was killed. See § 13A-5-40(a)(15), Ala. Code 1975. By a vote of 11 to 1, the jury recommended that Towles be sentenced to death. The trial court followed the jury's recommendation and sentenced Towles to death. The Court of Criminal Appeals reversed Towles's conviction and sentence in a per curiam opinion. Towles v. State, [Ms. CR-09-0396, March 29, 2013] __ So. 3d __ (Ala. Crim. App. 2013). The State petitioned this Court for a writ of certiorari, which we granted.

<u>Facts and Procedural History</u>

The Court of Criminal Appeals set forth the following statement of facts:

"On the morning of December 4, 2006, Shalinda Glass arrived at the Conoco gas station on Baltimore Avenue in Albertville. Ronnie Cook, who was at the time at the gas station to complete a sales order, took note of Glass because she drove her Nissan Altima automobile from one side of the lot to the other several times before she parked her vehicle in front of a gas pump. Cook watched Glass and Shaliyah Glass, Glass's seven-year-old daughter, get out of the vehicle and enter the gas station.

"After they entered the Conoco gas station, Cook saw a blue Ford pickup truck stop beside Glass's Altima. Cook then saw a black male, who had the same

2

general physical characteristics as Towles, get into the Altima and then leave the Conoco gas station in the Altima. Cook did not see the black male get out of the pickup truck, but he stated that the black male was close to the passenger door of the pickup truck when Cook first noticed him. Cook testified that the pickup truck followed the Altima away from the Conoco gas station.

"When Glass left the gas station with Shaliyah and found her Altima missing, she used a pay phone to telephone Towles. After Towles failed to answer, Glass telephoned 911. Glass told the emergency dispatcher that her Altima was missing and that her five-year-old son, Geontae, was asleep in the backseat of the vehicle.

"The State presented evidence that the blue pickup truck Cook saw belonged to Bobby Spydell. Towles and Spydell had been friends since childhood, and the two men were business partners, operating a barbeque restaurant together. According to Spydell, Towles telephoned Spydell around 2 or 3 a.m. on December 4. Towles told Spydell that he needed Spydell to pick him up in Albertville. Spydell immediately left to meet Towles in his Ford pickup truck.

"Spydell met Towles at a house in Albertville. At Towles's direction, Spydell drove Towles to a parking lot across the street from the Conoco gas station. Towles then asked Spydell to take him across the street to the Conoco gas station. Once there, Towles got out of the pickup truck, briefly walked away from the pickup truck and returned, throwing cash on the passenger seat for Spydell. Towles then walked toward the entrance of the Conoco gas station, and Spydell drove his pickup truck to his house.

"While the search for Geontae and the Altima was ongoing, Investigator J.T. Cartee of the Albertville

Police Department interviewed Glass and Towles. Towles had few details to share with Investigator Cartee at that time. Investigator Cartee subsequently became aware of the involvement of the blue pickup truck. In a second interview with Investigator Cartee, Towles denied any knowledge of a blue pickup truck or of its possible owner.

"Alabama State Trooper William Randall, Jr., who was at the time a deputy with the Marshall County Sheriff's Office, participated in a search of Towles's residence located on Broad Street in Albertville. Towles had consented to the search. During the search, Trooper Randall found a receipt for a utility bill in the name of 'Vicki Towles.' The address listed on the receipt was not Broad Street but was a Boaz address on Shady Grove Road. Trooper Randall traveled to the Shady Grove address, secured the residence, and awaited the arrival of deputies with the Etowah County Sheriff's Office.

"Etowah County Sheriff Todd Entrekin arrived at the Shady Grove address and entered the residence. Sheriff Entrekin and some of his deputies performed a sweep of the home searching for Geontae. Although he did not find Geontae, Sheriff Entrekin did note that the layout of the residence appeared to match a description given by Shaliyah to officers of the house in which she and Geontae had stayed the weekend before Geontae's alleged kidnapping. Sheriff Entrekin left the residence and returned to the sheriff's office, intending to return with a search warrant for the residence.

"While he was at the sheriff's office, Sheriff Entrekin was informed that the missing Altima had been discovered in the garage of the Shady Grove residence. Inside the trunk of the Altima officers found Geontae's body wrapped in a blanket. Among other items recovered from the backseat of the Altima was a blue-and-white-striped bedsheet with reddish brown stains. Subsequent DNA testing of the

stains on the bedsheet by Deborah Dodd, a forensic scientist with the Alabama Department of Forensic Sciences, revealed that the stains matched the DNA profile of Geontae. On the bathtub in the back bathroom of the house, additional reddish brown stains were found. Dodd testified that these stains contained a mixed DNA profile, which is not uncommon for samples recovered in common areas, and that Geontae was most likely a contributor to the sample.

"Investigator Mike Jones of the Etowah County Sheriff's Office and Agent Brenn Tallent of the Federal Bureau of Investigation interviewed Towles at the sheriff's office at 3:15 a.m. on December 5, 2006. Towles was made aware of the discovery of Geontae's body. At the outset of the interview, Towles stated that he was 'responsible for what happened to Geontae' and that he did not want Shalinda charged in Geontae's death. Towles stated to Investigator Jones that he was outside his residence on Sunday evening when two masked men approached him and demanded that Geontae come outside. Towles agreed to the demand, believing that Geontae would not be harmed because he was a small child. Towles was then asked for money, and he gave them all the money he had, which he approximated at $15,000. Before leaving, one of the masked men took Geontae behind the house and beat him while the other masked man held Towles at gunpoint. Towles took Geontae inside the residence and told him that he would take Geontae to the doctor in the morning if he were not feeling well. Towles did not identify the men to Investigator Jones or Agent Tallent.

"Several items found in the Shady Grove residence cast doubt on Towles's statement to Investigator Jones and Agent Tallent. Specifically, officers recovered an assault rifle, a pistol, a bulletproof vest, and $33,382.

"Dr. Emily Ward, a state medical examiner, performed the autopsy on Geontae. Dr. Ward noted

5

1121099

many injuries she considered to be nonlethal. Geontae's body had abrasions on his arms, back, chest, stomach, groin, buttocks, legs, and left foot, and had bruising on his right thigh and right buttock. In addition to the fresh abrasions, Geontae's body revealed wounds that had begun healing, indicating to Dr. Ward that these wounds were likely sustained a few days before Geontae's death. Based on the curved nature of the wounds that had begun healing, Dr. Ward speculated that they had been inflicted with a belt.

"Geontae's body also presented more serious injuries. Incisions to the right buttock and thigh revealed that the muscles had a large accumulation of blood. Dr. Ward explained that the accumulation of blood was significant because it indicated that the injury was 'extremely forceful.' Further, the muscular damage sustained by Geontae caused an increase of myoglobin in the bloodstream, which Dr. Ward classified as a very toxic substance capable of causing kidney failure. The level of myoglobin in Geontae's bloodstream was 87 nanograms per milliliter, where a normal level would be less than 5 nanograms per milliliter.

"Geontae's lower back did not appear to have injuries to the skin, indicating that Geontae did not receive a direct blow to that area. However, the force applied to the buttocks was significant enough to cause hemorrhaging that reached Geontae's spinal cord. Based on the level of hemorrhaging in the nerve fibers of the lower portion of the spinal cord, Dr. Ward surmised that Geontae's injuries resulted in paralyzation. Dr. Ward testified that in her opinion Geontae died of complications from blunt-force injuries but that he could have survived had he received medical attention.

"Additionally, a portion of the skin on Geontae's buttocks was denuded. Dr. Ward testified that the denuded-skin injury was consistent with

6

having been struck with a piece of wood and that she asked investigators to return to the scene and to look for something similar to a piece of wood that may have been used to injure Geontae.

"Captain Jeff Hopper of the Etowah County Sheriff's Office was sent to the Shady Grove residence with instructions to look for a solid object two to four inches wide. Captain Hopper located a piece of wood on the property. The piece of wood was approximately four feet long and two inches wide. His attention was drawn to the piece of wood because it bore a reddish brown stain. Dodd performed DNA testing on the stain, determining that the stain was blood and that the bloodstain matched the DNA profile of Geontae.

"A search of a book bag recovered from the Altima yielded Geontae's school-conduct chart for the months of November and December. The chart displayed that Geontae had received a smiley face for the first two weeks of November but that Geontae had received a straight face on the chart's most recent entry. The State offered Geontae's conduct assessment as Towles's motive for killing Geontae.

"....

"At trial, the State offered the testimony of Shaquille Cameron, Towles's [other] son. Cameron, who was 15 years old at the time of trial, lived with Towles from the time he was 8 years old until he was 9. Cameron was removed from Towles's custody by the Alabama Department of Human Resources after Cameron appeared at school with an injury to his head. According to Cameron, Towles became angry with him because Towles found a number of cups under Cameron's bed. Cameron said that Towles picked up a metal box fan and struck Cameron's head with the fan. Additionally, Cameron alleged that on other occasions Towles struck him with his fists or with various implements, such as a belt, an extension

7

cord, or a broomstick. Cameron testified that the assaults were in response to disciplinary issues at school. Towles objected to the admission of Cameron's testimony on the ground that it violated Rule 404(b), Ala. R. Evid. The circuit court overruled Towles's objection, finding that Cameron's testimony was relevant and admissible for the limited purpose of proving Towles's intent.

"....

"The circuit court instructed the jury as follows with respect to Cameron's testimony:

"'Ladies and gentlemen, there was testimony during the course of the trial by the young man Shaquille Cameron. And I want to speak to you about that testimony and what weight or how you can use that testimony.

"'The Court charges you that there has been testimony in this case of prior bad acts by the defendant. You may not consider this testimony as evidence that the defendant had a bad character or that he acted in conformity with that character on the occasion that is the basis of the present charge; nor may you consider this evidence as proof that the defendant committed the acts alleged in this case.

"'You may only consider the evidence of prior acts as evidence of identity or of an intent, purpose or motive to commit the acts complained of in the indictment before you today.'[1]

---

[1]The State argued that Cameron's testimony was admissible to show motive, intent, and identity. The trial court overruled Towles's objection to the admission of Cameron's testimony, determining that the testimony was admissible for

1121099

> "... Towles did not object to the circuit court's jury instructions."

Towles v. State, __ So. 3d at __ (references to record and emphasis omitted).

Towles argued on appeal to the Court of Criminal Appeals that the admission of Cameron's testimony violated Rule 404(b), Ala. R. Evid., because, he argued, the sole purpose of that testimony was to establish Towles's bad character. Rule 404(b) provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ...."

---

the limited purpose of proving Towles's intent. At the charge conference before closing arguments, the trial court proposed instructing the jury that it could consider Cameron's testimony for purposes of proving identity, intent, and motive. Towles objected, stating that Cameron's testimony had been admitted for the limited purpose of showing intent. The trial court agreed and determined that the jury would be instructed that Cameron's testimony could be considered only as proof of intent. However, when the trial court gave the jury the limiting instruction regarding the prior-acts evidence, it gave the more expansive limiting instruction, which included the instruction that the jury could consider the evidence for purposes of identity, intent, and motive. Towles did not object to the instruction.

9

The Court of Criminal Appeals initially questioned the admissibility of Cameron's testimony under any exception to the exclusionary rule. However, the Court of Criminal Appeals assumed, without deciding, that, if the evidence relating to Towles's physical abuse of Cameron was relevant to show intent as the trial court had found, "'pursuant to the trial court's broad instruction, [the jury] ... remained free to consider that evidence for ... other [improper] purposes (including [motive and identity]).'" Towles, __ So. 3d at __ (quoting Ex parte Billups, 86 So. 3d 1079, 1087 (Ala. 2010)). This Court found plain error in Ex parte Billups, where the trial court's limiting instruction to the jury permitted the jury to consider collateral-bad-acts evidence for implausible purposes or for purposes other than those for which the collateral-bad-acts evidence was offered.

The Court of Criminal Appeals reversed Towles's conviction, finding that Cameron's testimony was inadmissible to prove identity and motive. As to identity, the Court of Criminal Appeals stated:

"Contrary to the circuit court's instructions, the jury could not properly consider Cameron's testimony under the identity exception to the exclusionary rule. '[T]he identity exception to the

general exclusionary rule of character ... contemplates the situation where the now-charged crime was committed in a novel and peculiar manner.' Charles W. Gamble and Robert J. Goodwin, McElroy's Alabama Evidence, § 69.01(8) (6th ed. 2009).

> "'"'When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused.'" Ex parte Baker, 780 So. 2d 677, 680 (Ala. 2000) (quoting United States v. Clemons, 32 F.3d 1504, 1508 (11th Cir. 1994) (further citations omitted)). ... "'Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated ... rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'" Hurley v. State, 971 So. 2d 78, 83 (Ala. Crim. App. 2006) (quoting 1 McCormick on Evidence § 190 at 801-03 (4th ed. 1992) (footnotes omitted)).'

"Moore v. State, 49 So. 3d 228, 233 (Ala. Crim. App. 2009).

"The primary assault to which Cameron testified involved Towles's use of a metal box fan. The only apparent similarity between the assault Cameron suffered and the manner in which Geontae was killed is that Cameron and Geontae are both Towles's sons. During the acts at issue, different implements were used by Towles -- Cameron was assaulted with a metal box fan and Geontae was killed with a piece of wood; the primary injuries differed -- Cameron was struck on his head and Geontae on his buttocks; and the apparent impetus for the beatings was different -- Cameron was assaulted for having cups under his bed, whereas the State's offered motive was that Geontae

had a less than satisfactory conduct report from school. In short, there was no showing that the assaults to which Cameron testified and the manner in which Geontae was killed possessed the novelty or peculiarity necessary to render Cameron's testimony admissible under the identity exception. In fact, the circuit court explicitly recognized that the identity exception was not applicable. Accordingly, the circuit court erred by allowing the jury to consider Cameron's testimony for the purpose of establishing Towles's identity as Geontae's murderer."

Towles, __ So. 3d at __ (citations to record omitted).

As to motive, the Court of Criminal Appeals stated:

> "'Motive is defined as "an inducement, or that which leads or tempts the mind to do or commit the crime charged." Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has also been described as "that state of mind which works to 'supply the reason that nudges the will and prods the mind to indulge the criminal intent.'" [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]'

> "Bowden v. State, 538 So. 2d 1226, 1235 (Ala. 1988).

> "The State argues on appeal that Cameron's testimony was admissible, and therefore properly considered by the jury, under the motive exception to the exclusionary rule. Specifically, the State cites Bedsole v. State, 974 So. 2d 1034 (Ala. Crim. App. 2006), arguing that the assaults on Cameron 'tended to show that Towles was motivated to physically beat or assault children for disciplinary problems,' particularly those disciplinary problems that occur at school.

"In Bedsole, this Court held that evidence of similar collateral sex acts with a child was admissible under Rule 404(b), Ala. R. Evid., to prove that the appellant was 'motivated by an unnatural sexual desire for young girls.' Bedsole, 974 So. 2d at 1038-40; see also Ex parte Register, 680 So. 2d 225, 226-28 (Ala. 1994); Garner v. State, 977 So. 2d 533, 536-38 (Ala. Crim. App. 2007). However, the liberal view of the motive exception to Rule 404(b) found in Bedsole, Register, and Garner has been narrow in application. Alabama courts have not expanded the holdings of these cases beyond the scope of cases involving the sexual abuse of a minor, and we decline to do so today.

"Simply stated, there was no logical tendency to lead to any inference that Towles, because he had assaulted his son Cameron three years earlier, was motivated to kill Geontae. Accordingly, the jury should not have been instructed that it could consider Cameron's testimony as evidence of Towles's motive."

Towles, __ So. 3d at __.

Additionally, the Court of Criminal Appeals concluded:

"The circuit court's instructions were erroneous because they permitted the jury to consider Cameron's testimony for improper purposes. Given the highly prejudicial nature of collateral acts involving child abuse, this Court holds that the erroneous jury instructions '"affected [Towles's] substantial rights and ... seriously affected the fairness and integrity of the proceeding against him."' Ex parte Billups, 86 So. 3d [1079] at 1086 [(Ala. 2010)] (quoting Billups v. State, 86 So. 3d 1032, 1079 (Ala. Crim. App. 2009) (Welch, J., dissenting))."

13

1121099

<u>Towles</u>, __ So. 3d at __. Presiding Judge Windom dissented for the same reasons stated in her special writing in <u>R.C.W. v. State</u>, [Ms. CR-11-0387, November 2, 2012] __ So. 3d __ (Ala. Crim. App. 2012) ("<u>R.C.W. I</u>"), which we discuss in greater detail infra.

### Standard of Review

Towles objected to the admission of the collateral-bad-acts evidence on the ground that the evidence violated Rule 404(b), Ala. R. Evid. "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." <u>Ex parte Loggins</u>, 771 So. 2d 1093, 1103 (Ala. 2000). "This is equally true with regard to the admission of collateral-acts evidence. See <u>Davis v. State</u>, 740 So. 2d 1115, 1130 (Ala. Crim. App. 1998)." <u>Irvin v. State</u>, 940 So. 2d 331, 345 (Ala. Crim. App. 2005). Further, Rule 45, Ala. R. App. P., provides:

> "No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, ... unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire case, it should appear that the error complained of has probably

14

1121099

> injuriously affected substantial rights of the
> parties."

This Court stated in Ex parte Crymes, 630 So. 2d 125, 126

(Ala. 1993):

> "[T]his Court has stated that the reviewing court
> must determine whether the 'improper admission of
> the evidence ... might have adversely affected the
> defendant's right to a fair trial,' and before the
> reviewing court can affirm a judgment based upon the
> 'harmless error' rule, that court must find
> conclusively that the trial court's error did not
> affect the outcome of the trial or otherwise
> prejudice a substantial right of the defendant."

See also Ex parte Greathouse, 624 So. 2d 208, 210 (Ala. 1993)

(noting that the proper harmless-error inquiry asks, absent

the improperly introduced evidence, "'is it clear beyond

reasonable doubt that the jury would have returned a verdict

of guilty?'" (quoting United States v. Hastings, 461 U.S. 499,

511 (1983))).

Although Towles objected to the admission of the

collateral-bad-acts evidence, the record does not demonstrate

that Towles objected to the actual limiting instruction given

to the jury. As discussed supra in note 1, the trial court

proposed at the charge conference instructing the jury that it

could consider Cameron's testimony for purposes of proving

identity, intent, and motive. Towles objected, stating that

15

1121099

Cameron's testimony could be considered only for the limited purpose of showing intent. The trial court agreed and concluded that the jury would be instructed that Cameron's testimony could be considered only as proof of intent. However, when the trial court charged the jury, it gave the more expansive limiting instruction, which included the instruction that the jury could consider Cameron's testimony for purposes of identity, intent, and motive. Towles did not object to the instruction. Towles contends on appeal that he preserved for appellate review the issue of the limiting instruction because "[a] defendant may make a clear objection at the charge conference in lieu of objecting at the close of the oral instructions." Withee v. State, 728 So. 2d 684, 688 (Ala. Crim. App. 1998). Although a defendant may make an objection to a jury charge at the charge conference in lieu of objecting at the close of the trial court's oral charge to the jury, the defendant must obtain an adverse ruling from the trial court at the charge conference in order for the issue to be preserved for appellate review. This court may review only those matters on which the trial court has made rulings adverse to the party seeking review. Breckenridge v. State,

16

1121099

628 So. 2d 1012, 1018 (Ala. Crim. App. 1993). Here, Towles received a favorable ruling from the trial court at the charge conference when he objected to the proposed limiting instruction. Thus, Towles was required to object to the trial court's more expansive limiting instruction during the trial court's oral charge to the jury in order to preserve the issue for appellate review. He did not. Accordingly, the issue regarding the trial court's limiting instruction is reviewable for plain-error only. See Rule 45A, Ala. R. App. P.

> "'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L. Ed.2d 1 (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." See Ex parte Price, 725 So. 2d 1063 (Ala. 1998).'"

Ex parte Brown, 11 So. 3d 933, 935-36 (Ala. 2008) (quoting Hall v. State, 820 So. 2d 113, 121-22 (Ala. Crim. App. 1999)).

## Discussion

The State argues that the Court of Criminal Appeals erred in reversing Towles's conviction based on the admission of Cameron's testimony because, it says, the testimony was

17

relevant and admissible to prove Towles's motive for killing Geontae. The State further argues that the Court of Criminal Appeals erred in failing to apply a harmless-error analysis to the trial court's erroneous limiting instruction, which allowed the jury to consider Towles's collateral bad acts for improper purposes. Towles contends that the Court of Criminal Appeals did not err in determining that Cameron's testimony was inadmissible to show motive because, he says, there was no logical or factual connection between Geontae's killing and the incidents of abuse testified to by Cameron.

Rule 404(b) has been explained as follows:

"'"'On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.'" Pope v. State, 365 So. 2d 369, 371 (Ala. Crim. App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01. (3d ed. 1977) "'This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has

almost an irreversible impact upon the minds of the jurors.'" <u>Ex parte Arthur</u>, 472 So. 2d 665, 668 (Ala. 1985), quoting <u>McElroy's supra</u>, § 69.01(1)....

"'... The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. <u>Willis v. State</u>, 449 So. 2d 1258, 1260 (Ala. Crim. App. 1984); <u>Scott v. State</u>, 353 So. 2d 36 (Ala. Crim. App. 1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. "'Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.'" <u>Averette v. State</u>, 469 So. 2d 1371, 1374 (Ala. Crim. App. 1985), quoting <u>United States v. Turquitt</u>, [557 F.2d 464] at 468-69 [(5th Cir. 1977)].'"

<u>Ex parte Jackson</u>, 33 So. 3d 1279, 1284-85 (Ala. 2009) (quoting

<u>Robinson v. State</u>, 528 So. 2d 343, 347 (Ala. Crim. App.

1986)).

"'"[I]t is 'only when the probative value of evidence is "substantially outweighed by the danger of <u>unfair</u> prejudice," ... that

19

relevant evidence should be excluded.' United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir. 1982) (emphasis in original). '[T]he probative value of the evidence of other offenses must also be balanced against its "prejudicial nature" to determine its admissibility. "Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.' State v. Daigle, 440 So. 2d 230, 235 (La. Ct. App. 1983).

"'"'Of course, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n.31 (2nd ed. 1972).'

"'"State v. Forbes, 445 A. 2d 8, 12 (Me. 1982)."'"

White v. State, [Ms. CR-09-0662, August 30, 2013] __ So. 3d __, __ (Ala. Crim. App. 2013) (quoting Averette v. State, 469 So. 2d 1371, 1374 (Ala. Crim. App. 1985)).

Regarding the motive exception to Rule 404(b), this Court has stated:

"'Motive is an inducement, or that which leads or tempts the mind to do or commit the crime

20

charged.' <u>Spicer v. State</u>, 188 Ala. 9, 26, 65 So. 972, 977 (1914). Motive is 'that state of mind which works to "supply the reason that nudges the will and prods the mind to indulge the criminal intent."' C. Gamble, <u>Character Evidence[: A Comprehensive Approach</u>], at 42 [(1987)]. 'Furthermore, testimony offered for the purpose of showing motive is <u>always admissible</u>. It is permissible in <u>every criminal case</u> to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' (Emphasis in original, citations omitted.) <u>Bowden v. State</u>, 538 So. 2d 1226, 1235 (Ala. 1988)."

<u>Ex parte Register</u>, 680 So. 2d 225, 227 (Ala. 1994).

As mentioned in the Court of Criminal Appeals' statement of facts quoted above, the State offered Geontae's negative-conduct assessment as Towles's motive for killing Geontae. The State sought to establish that as the motive with testimony from Cameron relating to collateral acts of abuse perpetrated upon him by Towles. Cameron was 15 years old at the time of trial. Cameron testified that when he was nine years old he was living with Towles, who is his biological father. Cameron stated that Towles would "spank" him for getting into trouble at school:

"Q. What did you usually get into trouble about?

"A. School, acting up.

"Q. Did you get in worse trouble if you had been in trouble at school?

21

1121099

"A. Yes, ma'am.

"....

"Q. Describe for us, if you will, what you were spanked with.

"A. Belts and extension cords.

"Q. Were they used together or separately?

"A. Separately.

"Q. What came first?

"A. The belts did.  And then the extension cords followed after my behavior got worse in school.

"....

"Q. Was there ever an occasion where you were hit with something other than the items that you have described for us now?

"A. Yes, ma'am.

"Q. What was that?

"A. A broomstick.

"Q. And what happened with the broomstick?

"A. The broomstick broke.  Just like one of the little flimsy ones with the kind of flimsy metal on it.

"....

"Q. Did you ever get hit with anything else?

"A. Yes, ma'am.

22

"Q. What was that?

"A. His fist.

"Q. Tell us about that, if you will.

"A. Well, one time I got hit in my mouth. And then after the extension cord stopped working he told me we were going to start fighting if I got into any more trouble.

"Q. And he hit you with his fist in your mouth?

"A. Yes, ma'am.

"Q. What did he do after he hit you with his fist in your mouth?

"A. Well, he cried. We came back from the doctor, and a day later he came and apologized to me.

"Q. Did he cry before he took you to the doctor?

"A. No, ma'am."

Cameron was eventually removed from Towles's home by the Alabama Department of Human Resources ("DHR") after Towles struck him in the head with a metal "box" fan. Cameron stated that Towles entered his bedroom one morning before school and discovered a number of plastic drinking cups under his bed. Cameron testified that Towles began "fussing" and "yelling" at him because the cups had not been put away. He stated that Towles then picked up a metal "box" fan from the floor and

swung it at him, striking him in the head. Cameron testified that the blow to his head with the fan produced a golf-ball-size knot on his head that was noticed by students at his school. Cameron's teacher informed the school's principal, who then contacted DHR. Cameron was removed from Towles's home, and he never returned.

Geontae's teacher testified that when Geontae received the negative-conduct grade on the Friday before he was killed, Geontae stated that he "would be getting in trouble when he got home." The State's evidence indicates that Geontae died after being beaten with a wooden implement. Cameron testified that he suffered physical abuse at the hands of Towles following disciplinary issues at school. Cameron's testimony indicated that Towles would become angered when Cameron got into trouble at school and responded by beating him with various implements that happened to be at hand, including belts, extension cords, a broomstick, and his fists. Although the last incident of physical abuse perpetrated upon Cameron by Towles before Cameron was removed from Towles's home was brought about by Towles's discovery of drinking cups under Cameron's bed, as opposed to a disciplinary issue at school,

Towles was nevertheless motivated to punish Cameron for the disciplinary infraction by striking him with an implement close at hand, i.e., the metal "box" fan.

The State offered Geontae's negative-conduct assessment as Towles's motive for killing Geontae. The State sought to establish this motive with testimony from Cameron as to prior acts of abuse perpetrated upon him by Towles following disciplinary issues at school. Cameron's testimony, viewed in its entirety, establishes the logical inference that Towles was motivated to beat or assault his children because of disciplinary issues at school. Accordingly, we conclude that the collateral-acts evidence introduced by the State through Cameron's testimony was relevant and reasonably necessary to the State's case because it related to motive and that the probative value of the evidence is not substantially outweighed by its potential prejudicial effects. Ex parte Jackson, supra.[2]

---

[2]Although we do not necessarily agree with the Court of Criminal Appeals' entire reasoning as to its determination that the collateral-acts evidence in this case was inadmissible to show identity, we do agree with that court's conclusion that Cameron's testimony was inadmissible for the purpose of establishing Towles's identity as Geontae's murderer.

Having determined that Cameron's testimony was admissible under the motive exception to Rule 404(b), Ala. R. Evid., we must now address the issue of the trial court's limiting instruction. Relying on this Court's decision in Ex parte Billups, 86 So. 3d 1079 (Ala. 2010), the Court of Criminal Appeals determined that the trial court's limiting instruction to the jury was erroneous because it permitted the jury to consider Cameron's testimony for the improper purposes of proving intent and identity.

In Ex parte Billups, the defendant was indicted in June 2005 for the murder of Stevon Lockett. The defendant had been indicted in October 2004 on 13 counts of capital murder in relation to the killing of four men at the Avanti East Apartments in Birmingham. In November 2005, the defendant was convicted of 13 counts of capital murder in connection with the Avanti East killings. The trial court sentenced the defendant to death.

In December 2005, before the defendant was tried for Lockett's murder, the State gave the defense notice of its intent to present evidence regarding the defendant's involvement in the Avanti East killings during his trial for

26

Lockett's murder. The trial court, over the defendant's objection, determined that the evidence regarding the defendant's involvement in the Avanti East killings was admissible "'based upon the close proximity, the fact that the same weapon was used, and the fact that [the offenses] [were] very similar.'" Ex parte Billups, 86 So. 3d at 1081.

At trial, the State presented an overwhelming amount of evidence relating to the defendant's involvement in the Avanti East killings. The evidence presented by the State consisted of eyewitness testimony of the Avanti East killings by two witnesses; testimony of forensic experts, a firearms expert, and a detective relating to the Avanti East killings; and photographic evidence demonstrating the victims' wounds. The State first mentioned evidence relating to the defendant's involvement in the Avanti East killings in its opening statement, during which the State provided the jury with a detailed account of those killings and displayed postmortem photographs of the four victims of the Avanti East killings. During its case-in-chief, the State called seven witnesses who testified regarding the Avanti East killings. During its cross-examination of the defendant, the State asked several

27

questions regarding the defendant's involvement in the Avanti East killings. The State also introduced during its cross-examination of the defendant the postmortem photographs of the victims of the Avanti East killings that it had displayed during the opening statement. Finally, the State made numerous references to the Avanti East killings in its closing argument. The defendant objected on several occasions to the introduction of the evidence relating to his involvement in the Avanti East killings, arguing, among other things, that the evidence was inadmissible in that it was unnecessary and prejudicial.

The trial court instructed the jury as follows regarding its consideration of the evidence of the defendant's involvement in the Avanti East killings:

> "'Ladies and gentlemen, let me tell you one thing about this testimony. You're hearing testimony today about another incident that allegedly occurred, not the same one that [the defendant] is actually charged with in this case.

> "'The law is clear that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of other crimes allegedly committed by the defendant cannot be used to show bad character.

1121099

> "'The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining either motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> "'I'm going to repeat those for you. But if you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in Stevon Lockett's death, then you can consider this evidence.
>
> "'But it cannot be used by you for any other purpose; all right?'"

Ex parte Billups, 86 So. 3d at 1082. Further, the trial court stated the following in its final instructions to the jury:

> "'Now, as I instructed you during the trial, there's been some testimony regarding an allegation of other crimes. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of the other crimes allegedly committed by the defendant cannot be used to show bad character. It cannot be used to show bad character. The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, as I have instructed you. If you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in Stevon Lockett's death, then you can consider it. But it cannot be used by you for any other purpose.'"

29

Ex parte Billups, 86 So. 3d at 1082.

The Court of Criminal Appeals concluded that the trial court did not err in admitting the collateral-acts evidence regarding the defendant's involvement in the Avanti East killings, stating, in relevant part, that that evidence "was relevant to establish [the defendant's] identity, intent, pattern or plan." Billups v. State, 86 So. 3d 1032, 1053 (Ala. Crim. App. 2009). As to the trial court's limiting instruction regarding the collateral-acts evidence, the Court of Criminal Appeals noted that "the trial court repeatedly instructed the jury as to the limited purpose for which evidence about the [Avanti East] killings ... was being admitted" and that the trial court "specifically instructed the jury that it could not use the collateral bad act evidence to show [the defendant's] bad character or to show that he acted in conformity therewith." Billups, 86 So. 3d at 1053.

Judge Welch authored a vigorous dissent to the Court of Criminal Appeals' opinion, concluding that, although the collateral-acts evidence relating to the Avanti East killings may have been admissible to show motive, it was not reasonably necessary to prove motive and that the prejudicial

30

1121099

impact of the substantial evidence relating to the Avanti East killings so outweighed its probative value that the motive exception did not justify its admission into evidence. Billups, 86 So. 3d at 1073. Specifically, Judge Welch stated:

"The record in this case presents a textbook example of the reason the exclusionary rule prohibiting collateral-act evidence was created; the extensive evidence of collateral acts in [the defendant's] trial for the murder of Lockett permitted this trial to become, for all intents and purposes, a trial for murders of the four Hispanic men as well. The inadmissible collateral evidence diverted the jurors' minds from the main issue of [the defendant's] criminal responsibility for Lockett's death and had an irreversible impact on the jury's decision-making process in this case. ...

"....

"In addition to the fact that the evidence about the quadruple murders was unnecessary to the State's case, the evidence was overwhelmingly and unduly prejudicial to [the defendant]. The State presented such substantial evidence and argument about the quadruple-murder case, beginning in its opening argument to the jury when it displayed photographs of the four victims, that the record reads almost as if [the defendant] were being tried for both crimes in this trial. There was no way the jury could have excluded consideration of the significant and detailed collateral evidence as impermissible character evidence and there was a substantial danger that the jury would have made an impermissible inference, based on the collateral evidence, that [the defendant] was a depraved massacring killer so he probably killed Lockett,

31

too. Allowing the jury to hear the collateral evidence was far more prejudicial than probative of the issues the majority contends it was admissible to prove."

Billups, 86 So. 3d at 1072-77. Additionally, Judge Welch concluded that the trial court did not properly instruct the jury as to the purposes for which it could consider the collateral-acts evidence of the defendant's involvement in the Avanti East killings and that the erroneous limiting instruction actually served to exacerbate the error caused by admitting the collateral-acts evidence. Judge Welch stated:

"[A]lthough the majority has correctly stated that the trial court did issue 'limiting' instructions, those instructions were wrong as a matter of law. The trial court accepted the State's invitation at trial to instruct the jury that it could use the collateral-act evidence for any of the reasons listed in Rule 404(b), [Ala. R. Evid.,] even though the State never argued that the evidence was admissible for most of those purposes. The State never argued that evidence about the [Avanti East killings] fell within the exceptions in the exclusionary rule for evidence related to opportunity, preparation, knowledge, or absence of mistake or accident. Thus, the trial court, by issuing its erroneous instructions, greatly enhanced the prejudice caused when evidence about the [Avanti East killings] was admitted because the erroneous instructions permitted the jury to consider the illegal evidence for many issues other than those for which it was purportedly admitted.

"This Court considered a similar issue in McAdory v. State, 895 So. 2d 1029 (Ala. Crim. App.

32

2004), when the trial court incorrectly instructed the jury about the issues relative to which evidence of the defendant's prior crimes could be considered. The Court stated: 'A limiting curative instruction only mitigates the prejudicial admission of illegal evidence if the instruction is legally sound. The jury could not have considered the prior convictions for knowledge and intent because neither was at issue.' 895 So. 2d at 1036. Thus, not only was substantial, prejudicial evidence about the [Avanti East killings] erroneously admitted, but the jury also received misleading instructions that permitted it to consider that prejudicial evidence for issues far beyond those for which the evidence was initially admitted. The confusion of the jury and the probable prejudice to [the defendant] is obvious and exacerbated the devastating harm that resulted from the erroneous admission of the testimony. Although defense counsel did not object to the instructions, based on the record as a whole, I believe that the error affected [the defendant's] substantial rights and that it seriously affected the fairness and integrity of the proceeding against him."

Billups, 86 So. 3d at 1078-79 (emphasis added).

The defendant argued to this Court that the trial court had committed reversible error in instructing the jury as to the purposes for which it could consider the collateral-acts evidence because, he argued, the trial court's limiting instruction allowed the jury to consider the collateral-acts evidence for purposes not in dispute. In reversing the decision of the Court of Criminal Appeals, this Court stated:

33

"Assuming, without deciding, that the evidence regarding [the defendant's] involvement in the Avanti East killings was, as the State contends, relevant to show plan, identity, motive, and intent, the jury, pursuant to the trial court's broad instruction, nonetheless remained free to consider that evidence for numerous other purposes (including opportunity, preparation, knowledge, or absence of mistake or accident) that were indisputably not at issue in this case. See McAdory v. State, 895 So. 2d 1029, 1036 (Ala. Crim. App. 2004) (plurality opinion) (concluding that the jury could not have properly considered the defendant's prior convictions to show knowledge and intent because neither was at issue). Presenting the jury with such a far-reaching 'limiting' instruction carries with it the same problems as providing the jury with no specific purpose for considering the other crimes, wrongs, or acts evidence.

"'[A]n instruction should advise the jury on the purposes for which prior acts are admitted, meaning uses that are plausible in the case at hand, and should not include a laundry list of every conceivable use.' 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 4:30 at 789 (3d ed. 2007) (emphasis added). In this case, however, the jury was allowed to consider the evidence regarding [the defendant's] involvement in the Avanti East killings for several implausible purposes, including, among others, opportunity and absence of mistake or accident. For example, [the defendant] made no argument at trial that Lockett's killing was the result of an accident or that he lacked the opportunity to kill Lockett; rather, [the defendant's] defense was that another person, Charles Cooper, was responsible for Lockett's murder.

"By simply reciting the complete 'laundry list' of permissible theories under Rule 404(b), the trial court's instruction in this case gave the jury

34

inadequate guidance. See Ex parte Belisle, 11 So. 3d 323, 333 (Ala. 2008) ('[A]n appellate court "presume[s] that the jury follows the trial court's instructions unless there is evidence to the contrary."' (quoting Cochran v. Ward, 935 So. 2d 1169, 1176 (Ala. 2006))). The trial court's instruction also failed to limit the State to the purposes -- as nonspecific as they were -- that it advanced in support of admission of the evidence regarding [the defendant's] involvement in the Avanti East killings. Thus, we conclude that the trial court erred by failing to limit the jury's consideration of that evidence to only those purposes for which the evidence was purportedly offered by the State (plan, identity, motive, and intent). See Huddleston [v. United States, 485 U.S. 681 (1988)]; cf. United States v. Tse, 375 F.3d 148, 158 (1st Cir. 2004) (finding that the district court 'adequately limited the jury's consideration of [certain Rule 404(b)] evidence' when the court instructed the jury that it could not use that evidence 'to make a propensity inference' and that the jury could use that evidence to determine only the defendant's 'knowledge and intent').

"With regard to the erroneous jury instruction, we agree with Judge Welch's conclusions that '[t]he confusion of the jury and the probable prejudice to [the defendant] is obvious' and that 'the error affected [the defendant's] substantial rights and ... seriously affected the fairness and integrity of the proceeding against him.' Billups, 86 So. 3d at 1079 (Welch, J., dissenting). Accordingly, we conclude that, under the particular circumstances of this case, the trial court's failure to properly instruct the jury regarding the purposes for which it could consider the evidence of [the defendant's] involvement in the Avanti East killings constituted plain error."

Ex parte Billups, 86 So. 3d at 1085-86.

1121099

This Court recently decided <u>R.C.W. v. State</u>, [Ms. 1120562, May 30, 2014] __ So. 3d __ (Ala. 2014) ("<u>R.C.W. II</u>"). R.C.W. was tried for and convicted of sexually abusing T.W., his biological daughter. During the course of the trial the State presented testimony from R.C.W.'s two other biological daughters regarding specific acts of sexual abuse perpetrated upon them. R.C.W. argued that the evidence was not necessary to the State's case because, he said, motive, intent, and identity would not be contested at trial. The State argued that the evidence was admissible pursuant to Rule 404(b), Ala. R. Evid., for the purposes of showing motive, opportunity, intent, or plan. The trial court allowed the collateral-acts testimony and charged the jury as follows:

> "'"You have heard testimony and evidence regarding crimes, wrongs or bad acts regarding the Defendant. The Defendant is on trial only for the criminal charges that I have read to you in the indictments, not for anything else. Evidence of other crimes, wrongs, or bad acts was allowed into evidence not to prove that the Defendant may or may not be a bad person or may or may not be a person of bad character or that it made him more likely to commit the crimes charged in these indictments, because that would be wrong and legally impermissible. The evidence of other crimes, wrongs or bad acts was allowed into evidence for one narrow purpose only. That is, it may be considered by you for the limited purpose as regarding the Defendant's motive, opportunity, intent, or plan."'"

36

R.C.W. II, ___ So. 3d at ___ (quoting R.C.W. I, ___ So. 3d at ___). R.C.W. objected to the trial court's limiting instruction as follows:

> "'"Judge, with regard to the charge on [Rule] 404(b) evidence. The portion where you said that it's for the limited purpose of motive, opportunity, or plan, I would submit that those are not matters in controversy and by having it go -- I believe that that is different than what the State had said originally, was their purpose for offering that evidence. We except and object to the Court giving it with that broad of reason for it coming in."'"

R.C.W. II, ___ So. 3d at ___ (quoting R.C.W. I, ___ So. 3d at ___).

The Court of Criminal Appeals concluded on appeal that the collateral-act evidence of R.C.W.'s sexual misconduct involving T.W.'s half sisters was admissible to establish motive. However, the Court of Criminal Appeals, relying on this Court's decision in Ex parte Billups, further concluded that "it was reversible error for the trial court to allow the jury to consider the evidence of collateral sexual misconduct involving T.W.'s half sisters for the improper purposes of intent, opportunity, and plan," where those points were not at issue in R.C.W.'s trial, R.C.W. I, __ So. 3d at __, because a "jury may not consider evidence of collateral sexual

misconduct for an implausible purpose." <u>R.C.W. I</u>, ___ So. 3d at __.

Presiding Judge Windom authored a dissenting opinion in which she agreed with the holding of the main opinion that evidence of R.C.W.'s prior sexual abuse of his other daughters was admissible to establish his motive for sexually abusing T.W. <u>R.C.W. I</u>, __ So. 3d at __ . Presiding Judge Windom also agreed with the conclusion in the main opinion that the trial court's limiting instruction erroneously allowed the jury to consider evidence of R.C.W.'s collateral sexual abuse for purposes other than to show motive, i.e., for the "'improper purposes of intent, opportunity, and plan.'" <u>R.C.W. I</u>, __ So. 3d at __ (quoting main opinion). However, Presiding Judge Windom concluded that R.C.W. suffered no harm as the result of the trial court's erroneous jury instruction, which allowed the jury to consider evidence of R.C.W.'s collateral sexual abuse for purposes other than motive. Presiding Judge Windom explained:

> "In <u>Ex parte Billups</u>, 86 So. 3d at 1084-85, the Alabama Supreme Court held that when evidence of collateral bad acts is admitted for one or more purposes other than to show bad character, the circuit court's failure to give an instruction that limits the jury's consideration of that evidence to

only the purpose for which it was admitted constitutes error. Specifically, the Court held that the circuit court's limiting instruction relating to Rule 404(b) evidence that 'simply recit[ed] the complete "laundry list" of permissible theories under Rule 404(b) [for the admission of collateral-bad-act evidence], ... gave the jury inadequate guidance [and constituted error].' Billups, 86 So. 3d at 1086.

"The Supreme Court did not, however, create a per se rule requiring reversal every time a circuit court's limiting instruction relating to collateral bad acts includes purposes listed in Rule 404(b) for which the evidence was not admitted. To the contrary, the Supreme Court has repeatedly held that the failure to give a limiting instruction and/or the giving of an erroneous limiting instruction must be reviewed on a case-by-case basis. Snyder v. State, 893 So. 2d 482, 485 (Ala. 2001) (explaining that 'each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions ... must be determined on a case-by-case basis'); Ex parte Martin, 931 So. 2d 759, 768 (Ala. 2004) (same); Johnson v. State, 120 So. 3d 1119, 1126 (Ala. 2006) (same).

"....

"Although evidence of R.C.W.'s collateral bad acts was properly admitted as substantive evidence to show his motive and although the circuit court correctly prohibited the jury from considering R.C.W.'s collateral bad acts as evidence of his bad character, the majority finds reversible error in the circuit court's limiting instruction because it allowed the jury to consider that evidence for the 'improper purposes of [establishing] intent, opportunity, and plan[, points that were] not at issue in this case.' [R.C.W. I,] __ So. 3d at __. I, however, disagree. Because it was not plausible for evidence of R.C.W.'s collateral bad acts to

39

establish his intent, opportunity, or plan, any error in allowing the jury to consider the evidence for those purposes was harmless. In United States v. Levy-Cordero, 67 F.3d 1002, 1011 (1st Cir. 1995), the government offered evidence of the appellant's collateral bad acts to establish his consciousness of guilt. The trial court, however, gave a limiting instruction that directed the jury to consider the collateral-bad-act evidence for the purpose of establishing the appellant's intent and knowledge. Id. The United States Court of Appeals for the First Circuit held that a trial court's limiting instruction relating to the Rule 404(b) evidence improperly allowed the jury to consider the appellant's collateral bad acts as evidence of his intent and knowledge because those were not reasons that the evidence was admitted. Although the trial court improperly instructed the jury that it could consider the appellant's collateral bad acts for intent and knowledge, the First Circuit held that the error was harmless. Id. The Court explained that the erroneous instruction was harmless because there was 'no logical reason why [the collateral bad acts] would demonstrate appellant's intent or knowledge with respect to [charged] offenses ....' Id. Thus, the circuit court's instruction was harmless because it 'instructed the jury that it could draw an inference that the evidence could not logically support.' Id.

"In this case, the circuit court's instruction that allowed the jury to consider R.C.W.'s sexual misconduct for 'improper purposes of [establishing] intent, opportunity, and plan,' [R.C.W. I,] __ So. 3d at __, was harmless because there was 'no logical reason why [the collateral bad acts] would demonstrate appellant's intent[, plan, or opportunity] with respect to [charged] offenses....' Levy-Cordero, 67 F.3d at 1011. Stated differently, R.C.W.'s collateral sexual misconduct did not establish his specific intent to commit, his opportunity to commit, or a plan to commit the

charged offenses. Therefore, the circuit court's erroneous limiting instruction was harmless because it merely allowed the jury to 'draw an inference that the evidence could not logically support.' Id.

"Additionally, as the majority explains, R.C.W.'s intent, opportunity, and plan were not at issue at trial. R.C.W. was T.W.'s father, and they lived together at the time of the offenses. From this evidence, the jury must have drawn the conclusion that R.C.W., who was living with his daughter, had the opportunity to rape, sodomize, and sexually abuse her. Because R.C.W.'s opportunity to commit the charged offenses was clearly established at trial, the circuit court's instruction that allowed the jury to consider R.C.W.'s collateral bad acts for the purpose of establishing opportunity was harmless. Cf. Dawson v. State, 675 So. 2d 897, 900 (Ala. Crim. App. 1995) ('The erroneous admission of evidence that is merely cumulative is harmless.' (citing Reese v. City of Dothan, 642 So. 2d 511, 515 (Ala. Crim. App. 1993))); Woods v. State, 13 So. 3d 1, 23 (Ala. Crim. App. 2007). Likewise, as the majority states, '[t]he intent necessary to these types of crimes may be inferred by the jury from the acts themselves.' [R.C.W. I,] __ So. 3d at __. Because R.C.W.'s general intent was established by the acts themselves, the circuit court's instruction allowing the jury to consider additional evidence of intent was harmless. Cf. Dawson, 675 So. 2d at 900; Woods, 13 So. 3d at 23. Finally, as the majority states, R.C.W.'s identity was not at issue in this case because R.C.W. did not allege that someone else committed the crime. Because R.C.W. did not place his identity at issue, the jury had two choices: believe that R.C.W. committed the acts or believe that no acts occurred. Because R.C.W.'s identity was not at issue and the jury was left to decide only whether the acts occurred, allowing the jury to consider evidence to show a plan and thus R.C.W.'s identity was not harmful. Id.

1121099

"This is not a case in which evidence of collateral bad acts was improperly admitted or in which the circuit court erroneously allowed the jury to consider that evidence to show bad character. Instead, evidence of R.C.W.'s collateral sexual acts was properly admitted and considered as substantive evidence of his motive, and the circuit court correctly prevented the jury from considering that evidence for the sole purpose for which it is not allowed -- bad character and action in conformity therewith. Because evidence of R.C.W.'s collateral sexual misconduct was properly considered by the jury as substantive evidence of motive and because the circuit court prevented the jury from considering the evidence to prove bad character, the circuit court's limiting instruction that allowed the jury to also consider that evidence for additional implausible and/or irrelevant purposes was harmless. Therefore, I respectfully dissent."

R.C.W. I, __ So. 3d at __ (Windom, P.J., dissenting).  We granted the State's petition for a writ of certiorari in R.C.W. II to determine whether an erroneous limiting instruction as to otherwise properly admitted Rule 404(b) collateral-bad-acts evidence is subject to a harmless-error analysis.

The State argued to this Court that the collateral-acts evidence of R.C.W.'s sexual misconduct involving T.W.'s half sisters had been properly admitted to show motive.  The State conceded that the trial court's limiting instruction to the jury was erroneous in that it allowed the jury to consider the

42

collateral evidence of R.C.W.'s sexual abuse of his two other daughters for purposes other than to show motive, i.e., for the improper purposes of intent, opportunity, and plan. However, the State further argued that the trial court's limiting instruction, although erroneous, was harmless error because, despite being overly broad, it did, in fact, properly limit the jury's consideration of the collateral-sexual-misconduct evidence to the permissible purpose of showing motive and properly prevented the jury from considering the evidence for the impermissible purpose of showing the defendant's bad character. R.C.W. argued on appeal that the decision of the Court of Criminal Appeals properly followed this Court's decision in Ex parte Billups.

This Court agreed with the Court of Criminal Appeals' conclusions that the collateral-bad-acts evidence was properly admitted to show motive and that the trial court's limiting instruction was erroneous because it permitted the jury to consider the collateral-bad-acts evidence for the improper purposes of showing opportunity, intent, or plan. However, this Court in R.C.W. II went on to apply a harmless-error analysis to the erroneous limiting instruction, stating:

"Although not expressly stated in this Court's main opinion in Ex parte Billups, Judge Welch's dissent in Billups, with which this Court expressly agreed, was based on two independent conclusions. First and foremost, Judge Welch determined that a substantial amount of prejudicial evidence relating to the defendant's involvement in the Avanti East killings had been erroneously admitted at trial. As Judge Welch stated in Billups: 'The record in this case presents a textbook example of the reason the exclusionary rule prohibiting collateral-act evidence was created; the extensive evidence of collateral acts in [the defendant's] trial for the murder of Lockett permitted this trial to become, for all intents and purposes, a trial for murders of the four Hispanic men as well.' 86 So. 3d at 1072 (emphasis added). Second, Judge Welch determined that the overly broad limiting instruction that permitted the jury to consider the collateral-acts evidence for issues beyond those for which the evidence was initially admitted resulted in obvious confusion to the jury and probable prejudice that only exacerbated the already prejudicial effect of the erroneously admitted collateral-acts evidence. Billups, supra. In other words, Judge Welch determined that the already overwhelming amount of prejudicial evidence admitted became even more prejudicial when considered in context with the overly broad limiting instruction, which allowed the jury to consider the prejudicial evidence for many purposes other than those for which it was purportedly admitted. Given the sheer volume of prejudicial evidence admitted in Billups, the overly broad instruction given to the jury in that case regarding the purposes for which that evidence could be considered, including matters beyond those for which the evidence was initially admitted, certainly was prejudicial because the limiting instruction gave the jury little guidance and no limitations as to the proper purposes for which the jury could consider the collateral-acts evidence. See Ex parte Billups, 86 So. 3d at 1086 (stating that

44

'[p]resenting the jury with such a far-reaching "limiting" instruction carries with it the same problems as providing the jury with no specific purpose for considering the other crimes, wrongs, or acts evidence' and that, '[b]y simply reciting the complete "laundry list" of permissible theories under Rule 404(b), the trial court's instruction in this case gave the jury inadequate guidance'). Thus, Ex parte Billups can be read as standing for the proposition that an improper limiting instruction is prejudicial if, in effect, it offers little guidance or no limitations to the jury as to the proper purpose or purposes for which the collateral-act evidence could be considered.

"To be sure, the factual scenario present in Ex parte Billups is extreme, given the voluminous amount of prejudicial collateral-acts evidence admitted at trial coupled with an overly broad limiting instruction in which the trial court simply listed each possible exception to Rule 404(b). For that reason, the holding in Ex parte Billups is limited to a similar factual scenario and does not 'create a per se rule requiring reversal every time a circuit court's limiting instruction relating to collateral bad acts includes purposes listed in Rule 404(b) for which the evidence was not admitted.' R.C.W. [I], ___ So. 3d at ___ (Windom, P.J., dissenting).

"....

"... [U]nlike the situation in Ex parte Billups, the potential prejudicial effect resulting in this case from the admission of the evidence of R.C.W.'s prior sexual misconduct with his other daughters, coupled with the erroneous limiting instruction given by the trial court, was muted because of the limited amount of collateral-acts evidence admitted at trial. Here, the collateral-acts evidence was properly admissible to show motive and was limited to the testimony of R.C.W.'s other two biological

45

daughters, who testified to specific instances of similar sexual misconduct as alleged in this case. Furthermore, although the limiting instruction in this case erroneously allowed the jury to consider the collateral-acts evidence for issues not in dispute, the limiting instruction properly instructed the jury that it could consider the collateral-acts evidence for the purpose of motive and that it could not consider the evidence to show R.C.W.'s bad character and that he acted in conformity with that character. To the extent the trial court's limiting instruction allowed the jury to consider the collateral-acts evidence for issues not in dispute, we agree with Presiding Judge Windom's conclusion that '[b]ecause it was not plausible for evidence of R.C.W.'s collateral bad acts to establish his intent, opportunity, or plan, any error in allowing the jury to consider the evidence for those purposes was harmless.' R.C.W. [I], ___ So. 3d at ___ (Windom, P.J., dissenting). ...

        "....

        "Instructing the jury that it could consider the collateral-acts evidence for purposes for which it ultimately would not actually consider it did not prejudice R.C.W., because the trial court properly instructed the jury that it could consider the collateral-acts evidence for the proper purpose of motive. The instruction here, although overly broad, was not so broad that it essentially gave no guidance or no limitation to the jury as to the proper purpose for which the evidence could be considered. See Ex parte Billups, supra. Because the collateral-acts evidence was appropriately before the jury for the purpose of proving motive, and because the limiting instruction did not rise to the level of prejudicial ambiguity found in Ex parte Billups, any error arising from the trial court's limiting instruction was harmless."

46

1121099

<u>R.C.W. II</u>, __ So. 3d at __ (final emphasis added).

Although the State has argued, and this Court has concluded, that the collateral-acts evidence offered by Cameron's testimony was admissible to show motive, the State originally offered the testimony for the purposes of showing motive, intent, and identity. The trial court admitted the collateral-acts evidence for the sole purpose of establishing Towles's intent. However, the trial court subsequently instructed the jury that the evidence could be considered for purposes of establishing motive, intent, and identity. The Court of Criminal Appeals assumed for purposes of its decision that Cameron's testimony was admissible to establish Towles's motive and then determined pursuant to <u>Ex parte Billups</u>, supra, that the trial court's limiting instruction was erroneous because it permitted the jury to consider the testimony for other improper purposes, i.e., identity and intent. The State argues here that it was implausible that the jury could have relied on Cameron's testimony to find the specific intent required for a capital-murder conviction and that, to the extent the trial court erroneously instructed the

47

jury that it could consider Cameron's testimony for purposes of establishing intent, that error was harmless. We disagree.

In R.C.W. I and R.C.W. II, R.C.W.'s general intent was established by the acts of sexual abuse themselves perpetrated upon his daughter. Therefore, the trial court's instruction allowing the jury to consider the additional evidence of intent was harmless. However, in this case intent was a central issue to be determined because, in order to prove capital murder, the State was required to prove that Towles had the specific intent to kill Geontae, a child under 14 years of age. § 13A-5-40(a)(15), Ala. Code 1975. See Ziegler v. State, 886 So. 2d 127, 140 (Ala. Crim. App. 2003)(holding that "Alabama appellate courts have repeatedly held that, to be convicted of [a] capital offense and sentenced to death, a defendant must have had a particularized intent to kill"). Intent has been defined as "the ripened purpose to effect a result." Fuller v. State, 269 Ala. 312, 336, 113 So. 2d 153, 175 (1959). Dean Charles Gamble has addressed the admissibility of collateral-act evidence pursuant to the intent exception to Rule 404(b) as follows:

> "If the accused is charged with a crime that requires a prerequisite intent, collateral crimes,

48

acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court."

I Charles W. Gamble and Robert J. Goodwin, McElroy's Alabama Evidence § 69.01(5)(6th ed. 2009) (footnotes omitted). Further,

> "'"'[i]n a prosecution for murder, evidence of former acts of hostility between the accused and the victim are admissible as tending to show malice, intent, and ill will on the part of the accused.' White v. State, 587 So. 2d 1218, 1230 (Ala. Cr. App. 1990), affirmed, 587 So. 2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S. Ct. 979, 117 L.Ed. 2d 142 (1992)." Childers v. State, 607 So. 2d 350, 352 (Ala. Cr. App. 1992). "Acts of hostility, cruelty and abuse by the accused toward his homicide victim may be proved by the State for the purpose of showing motive and intent.... This is 'another of the primary exceptions to the general rule excluding evidence of other crimes.'" Phelps v. State, 435 So. 2d 158, 163 (Ala. Cr. App. 1983). See also Baker v. State, 441 So. 2d 1061, 1062 (Ala. Cr. App. 1983).'
>
> "Hunt v. State, 659 So. 2d 933, 939 (Ala. Crim. App. 1994). See Harris v. State, 489 So. 2d 688 (Ala. Crim. App. 1986) (prior acts of abuse toward child

49

victim were admissible to show motive and intent to murder). See also Harvey v. State, 579 So. 2d 22, 26 (Ala. Crim. App. 1990). 'Former acts of hostility or cruelty by the accused upon the victim are very commonly the basis for the prosecution's proof that the accused had a motive to commit the charged homicide.' 1 Charles W. Gamble, McElroy's Alabama Evidence § 45.01(8) (5th ed. 1996) (footnote omitted), and cases cited therein."

Burgess v. State, 962 So. 2d 272, 282 (Ala. Crim. App. 2005).

In this case the prior bad acts of assault and physical abuse were not perpetrated by Towles upon the victim Geontae. Rather, the prior assaults and abuse were perpetrated upon Geontae's older brother Cameron approximately three years before Geontae's murder. We cannot say that Cameron's testimony relating to the physical assaults he suffered at the hands of Towles approximately three years before Geontae's murder was relevant to show that Towles intended to kill Geontae. Further, where the jury was faced with deciding whether Towles intended to murder Geontae or to assault him for disciplinary issues at school, the admission of the collateral assaults perpetrated by Towles upon Cameron were highly prejudicial. The probative value, if any, of the testimony concerning the collateral assaults upon one son simply does not outweigh the undue prejudice to Towles in his

50

prosecution for the capital murder of his other son. See generally <u>Ex parte Jackson</u>, supra.

Accordingly the trial court's admission of the collateral-acts testimony to show intent and its limiting instruction to the jury that the jury could consider the testimony for purposes of establishing intent constitutes plain error because it "'"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."'" <u>Ex parte Brown</u>, 11 So. 3d at 935-36 (quoting <u>Hall v. State</u>, 820 So. 2d at 121).

## Conclusion

For the reasons set forth above, we affirm the judgment of the Court of Criminal Appeals.

AFFIRMED.

Stuart, Parker, Main, and Bryan, JJ., concur.

Murdock and Shaw, JJ., concur in the result.

Moore, C.J., and Wise, J.,* recuse themselves.

*Justice Wise was a member of the Court of Criminal Appeals when that court considered this case.